**Robert G. FRANKLIN, et al., Plaintiffs,**

v.

**SHEET METAL WORKERS INTERNATIONAL ASSOCIATION LOCAL UNION NO. 2, Defendant.**

**No. 06–0004–CV–W–GAF.**

United States District Court, W.D. Missouri, Western Division.

Feb. 21, 2008.

**ORDER**

GARY A. FENNER, District Judge.

Pending before the Court are Defendant Sheet Metal Workers International Association Local Union No. 2's ("Local 2") Motion for Summary Judgment and Plaintiffs Robert G. Franklin, et al.'s (collectively "Plaintiffs" or individually Robert Franklin ("Franklin"), Glen Steele ("Steele"), Edward Lewis ("Lewis"), Steve Bailey ("Bailey"), and Leon Booker ("Booker")) Cross–Motion for Partial Summary Judgment, both filed pursuant to Fed.R.Civ.P. 56 ("Rule 56"). (Doc. ## 58, 60). For the reasons set forth below, Local 2's Motion is GRANTED in part and DENIED in part. Plaintiffs' Motion is DENIED.

## DISCUSSION

### 1. Facts

#### A. The Parties

Local 2 is a labor organization with its principal office in Kansas City, Missouri. (Alexander Aff. ¶ 2). Its function is to negotiate the terms and conditions of employment for members of Local 2 with sheet metal contractors either recognizing Local 2 as the bargaining representative for sheet metal workers within Local 2's geographic jurisdiction or for whom the National Labor Relations Board ("NLRB") has certified Local 2 as the bargaining representative ("Local 2 contractors"). *Id.* Local 2's jurisdiction includes 100 counties in Missouri and Kansas further divided into six areas for wage-rate and administrative reasons. *Id.* at ¶¶ 6–7; Alexander Dep. 187:17–23. Approximately 65 of Local 2's 1200 members in the building trades are African American—25 of whom are apprentices. (Lind Dep. 88:25 to 89:8).

Plaintiffs are African–American sheet metal tradesman engaged in the construction industry. (Doc. # 59, pp.7–8). Plaintiffs Franklin and Bailey are currently Local 2 members. (Compl. ¶ 2). Plaintiff Steele was a Local 2 member until he was determined disabled; he retired on August 15, 2005. (Steele Activity History, Doc. # 59, Att. # 42). Plaintiff Lewis is a Local 2 member who completed his apprentice-

ship in 1975 but left the trade that year, returning in 1998. (Compl. ¶ 4; Lewis Dep. 16:8–11; 29:1–9). Plaintiff Booker was a Local 2 member until he was determined disabled, retiring on April 27, 2004. (Compl. ¶ 2; Booker Activity History, Doc. # 59, Att. # 44).

### B. Local 2's Referral Procedures

From 2001 to the present, contractors signatory to Local 2's Collective Bargaining Agreement ("CBA") have numbered between 70 and 100. (Alexander Aff. ¶ 8). Article 4 of the CBA provides

> [w]hen qualified journeymen sheet metal workers are required to properly execute work contracted for by the [signatory contractor] in the manner and under the conditions specified in this Agreement, the [signatory contractor] shall give the Union first opportunity with all other sources to provide suitable journeymen sheet metal workers. If the Union fails to supply journeymen sheet metal workers within forty-eight hours, the [signatory contractor] may hire such employees and refer them to [the Union] for enrollment.

> The Union shall select and refer applicants for employment without discrimination against such applicants because of race, color, religion, national origin, age, sex, or in any way affected by Union membership, by-laws, regulation, constitutional provisions or any other aspect or obligation of Union membership, policies or requirements.

> [Local 2 contractors] agree[ ] not to discriminate against able journeymen fifty-five (55) years of age and older who have ten (10) years good standing in Local

Union No. 2. The [signatory contractors] further agree[ ] to employ one such journeymen for each nine (9) other journeymen if same are available and does not violate discrimination law.

(CBA, §§ 4–2; 4–4; 4–8). The CBA does not specify the precise procedure by which Local 2 is to provide workers to Local 2 contractors.[1] See generally Id.

Local 2 therefore implements a referral procedure by which Local 2 members gain employment. (Alexander Dep. 347:10–28). The referral procedure allows unemployed Local 2 members to sign an "out of work" list ("OWL") maintained in the order of signing. (Howerton Dep. 206:4–5) Members who have signed the OWL remain on the list after Local 2 refers them to a Local 2 contractor until they accrue eighty hours of work. Id. at 207:7–13; Alexander Dep. 348:15 to 350:20. In addition, members who want to maintain their position on the OWL but do not want to be called for jobs can ask Local 2 to place them on "will call." (Flach Dep. 59:4–16).

Members who sign the OWL can limit the areas within Local 2's jurisdiction in which they are willing to work; Local 2 separately compiles this information in the members' activity house. (Alexander Aff. ¶ 10). If members turn down three jobs in areas they indicated they would work and for which they are called, Local 2 moves them to the bottom of the list. (Flach Dep. 59:1 to 65:24; 70:1 to 79:25; Referral Proc., Doc. # 59, Att. # 9). Members working on jobs outside Local 2's jurisdiction retain their position on the OWL but Local 2 does not call them until advised

---

**1.** Periodically in their briefs, Plaintiffs and Local 2 argue over whether a consent decree issued from this Court resolving prior discrimination claims against Local 2 required Local 2 to adopt and maintain the referral procedures it uses. (See Consent Decree,

Doc. # 68, Ex. 10). Whether or not this was the case, the Consent Decree expired in 1990 after which time Local 2 was free make efforts to renegotiate its policies as necessary to address problems. Id.

they are again available for work. (Alexander Dep. 385:9–17).

Signing the OWL is not the only way for Local 2 members to seek employment. *Id.* at 175:18 to 176:1. Rather, Local 2 procedures allow members to obtain employment with Local 2 contractors in one of three ways: solicitation, request, or referral. *Id.* First, members can solicit jobs through direct contact with Local 2 contractors which allows the contractor to decide whether or not to hire the member. (Steele Dep. 80:3–10; Booker Dep. 40:20 to 41:6). Solicitation is the most common method for Local 2 members to obtain employment. (Howerton Dep. 99:8–12; Alexander Dep. 324:9–18).

Second, Local 2 contractors can contact Local 2 and send in a form requesting a particular employee by name. (Flach Dep. 51:13 to 52:6). When a contractor calls Local 2 requesting a specific individual, Local 2 does not, as a matter of course, encourage the contractor to select individuals from the OWL. (Eslinger Dep. 219:17 to 220:14). Principals of Local 2 contractors sometimes attend Local 2 meetings and can have input in a contractor's hiring decisions. (Eslinger Dep. 223:24 to 225:11). These principals or representatives are often Local 2 members. (Davison Dep. 92:17 to 93:13; Huffman Dep. 38:6 to 41:8; Howerton Dep. 39:17 to 40:15).

Third, a referral occurs when a contractor contacts Local 2 to fill manpower needs but does not request specific members by name or respond to a solicitation. (Flach Dep. 49:13 to 51:12). Local 2's referral procedure states Local 2 will go down the list in contacting members on the OWL who have indicated they will work in that particular area and have any specialized skills the contractor may have requested. *Id.* at 49:13 to 51:12; 59:10 to 62:18; Referral Proc., Doc. # 59, Att. # 9. Contractors can request referrals of Local

2 members with specific skills, in which case Local 2's referral procedures direct it to determine whether the member next listed on the OWL has such a skill and to proceed down the OWL in order until it finds a qualified candidate who accepts the job. *Id.*

It is common for journeyman at the bottom of the OWL to get jobs quickly through solicitation and requests while journeymen at the top of the OWL for an extended period continue to seek placement through referral. (Huffman Dep. 255:3–22). It is also common for contractors to examine the OWL and request Local 2 members who are lower on the OWL than qualified minority or female journeymen. (Locke Dep. 90:2 to 91:14). In general, contractors are more likely to hire people they know and who have worked for them before and they use the OWL to find such people regardless of their position on the list. (Porter Dep. 66:24 to 67:7; 116:16–23; Locke Dep. 78:5 to 79:14). Local 2 representatives state good relationships, skills, attitude, behavior, and reputation are the most important characteristics for job security with Local 2 contractors. (Eslinger Dep. 252:13 to 253:20; Lind Dep. 104:4–12).

The OWL is available at the Local 2 hall for contractors to review and, to the extent aware of the members' ethnicity, determine which minority members are available for work. (Porter Dep. 205:13–23). Some Local 2 contractors have specifically requested minority members. (Howerton Dep. 86:1–23). Local 2 also maintains the OWL on its website which members and Local 2 contractors can access. (Phelps Dep. 38:1–24; Doc. # 69, p.47). At least one Local 2 contractor states his company has reviewed the OWL to determine whether minority members are available for work. (Phelps Dep. 35:23 to 36:7).

Contractors also state they view the OWL for other reasons, including to determine whether a member who has worked for them is available, to see whether a member with particular skills is available, and to see whether someone they have laid off has found other work. (Adams Dep. 54:3 to 55:12; 62:15 to 66:12; Phelps Dep. 38:17–19; Tanner Dep. 30:2–7). Local 2 contends its referral procedures allow Local 2 sheet metal workers to compete with one another for jobs to some extent and thus encourages skills development and proficiency. (Locke Dep. 186:13 to 187:25; Lind Dep. 134:16 to 135:22; Flach Dep. 227:17–21).

If work is slow in the trade, contractors make few requests for manpower referrals. (Flach Dep. 52:7–23; Huffman Dep. 112:21 to 113:16). In 2006, for example, Local 2 official Jim Flach ("Flach") recalls receiving only two general requests. (Flach Dep. 52:20–23). Local 2 official Jim Huffman ("Huffman") recalls consecutive months where no contractor requested general referrals. (Huffman Dep. 113:8–16). Nevertheless, Local 2 members generally work for numerous contractors during their careers, sometimes for several in a one-year span. (Flach Dep. 38:1–12; Alexander Dep. 175:6 to 176:19).

Local 2 members can also sometimes gain employment with contractors located outside Local 2's jurisdiction who undertake work within Local 2's territory. (Flach Dep. 72:12 to 73:25). Subject to one limited exception for work in food processing plants, such contractors are permitted to bring with them two workers who are not Local 2 members. (Huffman Dep. 160:5–19). Local 2 selects additional workers from its members, first selecting a foreman and steward from anywhere on the OWL based on an evaluation of leadership skills and then referring qualified members in the order in which they signed the OWL. (Chastain Dep. 38:8 to 40:25).

Business representative Gregory Chastain ("Chastain") has never selected an African American as a steward for an out-of-jurisdiction contractor, but he has selected an African American as foreman for such a contractor. Id. at 40:17–25; 102:5 to 103:25. Since beginning as a business representative in 2000, Huffman similarly has never referred an African–American foreman to an out-of-jurisdiction contractor. (Huffman Dep. 150:22 to 151:24). Huffman states he had an obligation to choose the people most qualified to manage and no available African Americans were qualified at the times in question. Id. Out-of-jurisdiction contractors cannot request specific journeymen from Local 2 and Local 2 members cannot solicit work from them. Id. at 91:23 to 92:5. These contractors must accept Local 2's referrals from the OWL in the order qualified workers appear on the OWL. Id. at 92:8 to 93:20.

Members of other unions may work for Local 2 contractors within Local 2's jurisdiction as "travelers" but Local 2 procedure states Local 2 must first exhaust the OWL without filling a contractor's request for manpower. (Flach Dep. 109:2–19). According to Local 2, if members turn down jobs or do not respond to calls, it considers the OWL exhausted when everyone has been called. Id.

Local 2's referral procedures require contractors to provide information to Local 2 regarding employing members. (Alexander Dep. 366:1–5; Flach Dep. 51:13 to 52:6). For example, if the contractor has hired a member pursuant to the member's application, the employer must send Local 2 a notice of solicitation. Id. If a contractor wants to request a specific member, it sends Local 2 a request for manpower by name, indicating whether the contractor will contact the member directly, has already contacted the member, or wants Lo-

cal 2 to contact the member on its behalf. *Id.*

Local 2 also maintains records showing (1) the date any member signed the OWL, (2) the current status of members on the OWL, (3) the contractor who hires the member, (4) the type of hiring transaction (solicitation, request, or referral), (5) whether the member is available for work, (6) the geographic areas in which the member is willing to work, and (7) the skills each member states he or she possesses. (Alexander Aff. ¶ 10). Through at least 2003, the computer system Local 2 uses for keeping employment records had a default setting of "solicitation" which led to discussions regarding record-keeping accuracy with the Equal Employment Opportunity Commission ("EEOC"). (Alexander Dep. 399:1 to 400:25).

Under the CBA, one of Local 2's roles is to investigate and try to resolve problems members have with Local 2 contractors. (Howerton Dep. 52:18–24). Local 2 business managers are responsible, in part, for assisting Local 2 contractors meet their equal employment opportunity obligations. (Barnett Dep. 38:25 to 39:5; 182:7–12).

### C. *Plaintiffs' Discrimination Claims*

Dr. Arthur Gutman ("Gutman"), Plaintiffs' expert in applied statistics in the context of personnel selection and Professor at the Florida Institute of Technology, performed a statistical analysis of the employment data Local 2 collected and found disparities between the number of hours African–American and white Local 2 members work. (Gutman Decl. ¶¶ 15–19). Gutman also found from 2000 to 2006 the majority of Local 2 contractors hired no, or very few, African–American members. *Id.* However, Local 2 business agent Charlie Porter ("Porter") could identify only three Local 2 members who have had less than 1200 hours of work in a year: Plaintiffs Franklin, Steele, and Booker. (Porter Dep. 69:16 to 70:21).

Local 2 has never had an African–American member serve as a business representative or in any of its other full-time paid positions. (Eslinger Dep. 364:25 to 365:5; 377:6–10; Lind Dep. 105:15–19). The president of Local 2, Jay Lind ("Lind"), recommends instructors to Local 2's Joint Apprentice Committee and none of the ten he has selected were African American. *Id.* Lind also has responsibility for appointing members to other positions in Local 2 and has not appointed African Americans to those positions, though he has made only two such appointments to date. *Id.* at 42:16 to 43:24.

In 2006 African–American member Edwin Locke ("Locke") ran for a position as business representative at Local 2 and sought inclusion on the Alexander–Eslinger ticket. (Locke Dep. 135:11 to 136:9). Alexander and Eslinger declined his request as a business decision. *Id.* at 142:1–23. After the election a Local 2 member informed Locke, even if the best person for the job, a representative needed "that ultra-conservative look" that Locke interpreted as being white. *Id.* at 142:1–23.

Locke suggests performance reports Local 2 members write with regard to apprentices are sometimes racially motivated and result in low numbers of African Americans in the sheet metal trade. *Id.* 49:4 to 50:19; 53:17 to 54:13. Further, Locke testified minority sheet metal workers in Local 2 can have a difficult time advancing their careers because they are unable to connect with established Local 2 cliques. *Id.* 56:1 to 57:15; 59:7 to 60:18; 62:25 to 63:24. Locke noted he sometimes receives complaints about discrimination, mistreatment, and hour disparities in his position on Local 2's executive board. *Id.* at 72:1 to 73:12.

Plaintiffs blame Local 2's referral procedure, which allows solicitation and requests, for their difficulty finding work. (Booker Dep. 38:3–12; 39:5–18; 79:23 to 80:13). Locke testified Local 2 practices have in fact caused minorities to be overlooked. (Locke Dep. 113:20 to 114:14). Locke further observes the playing field between African–American sheet metal workers and white sheet metal workers is not level and that Local 2 has a systemic problem it has perpetuated for the last 30 years which negatively impacts African–American members. *Id.* at 144:12 to 145:8. He believes three people, manager Kenneth Alexander ("Alexander"), president Lind, and secretary/business agent Bob Eslinger ("Eslinger"), essentially run Local 2 which prevents objective responses to members who suggest a problem exists. *Id.* at 117:24 to 199:22; 121:1 to 122:5. Despite knowledge of times when a greater percentage of African Americans than whites were on the OWL, Local 2 has never done anything to investigate the cause or develop a solution. (Eslinger Dep. 183:5 to 184:15; 248:18 to 249:1).

Although Local 2 did not investigate hiring and hour disparities, Local 2's referral procedure includes an appeal provision under which members who believe Local 2 has employed the referral procedure with discrimination or unfairly may seek relief. (Referral Proc., Doc. # 59, Att. # 9). The appeal provision provides as follows:

> Any journeyman shall have a right of appeal of any dispute or grievance out of and relating to the referral procedure. The Local Union and the party desiring appeal shall each designate an umpire. These two (2) umpires shall select a third impartial umpire. A majority vote of this designated group on any appeal shall be final, binding and conclusive on all parties.

*Id.* Plaintiffs allege the appeal process is futile because contractors and officials against whom a grievance is filed often hear the appeal and the only response they receive from informal complaints about the referral procedure is that Local 2 can do nothing to address the situation. (Franklin Decl. ¶ 47; Bailey Decl. ¶ 28; Steele Decl. ¶ 48; Lewis Decl. ¶ 48; Booker Decl. ¶ 35). As far as the Court can decipher, Plaintiffs confuse the appeal provision of the referral procedure with the grievance and appeal procedure relating to interpretation and enforcement of the CBA. (CBA, Art. 10, Doc. # 68, Ex. 1). The CBA appeal procedures provide for a Local Joint Adjustment Board composed of an equal number of Local 2 and contractor representatives, whereas the referral appeal procedure involves the determining vote of a neutral arbiter whom the parties choose. *Id.*; Referral Proc., Doc. # 59, Att. # 9. Internal disputes as to the referral procedure would be appealable to the neutral arbiter and not the Local Joint Adjustment Board. *Id.*

In any event, Plaintiffs maintain any sort of appeal would be futile, citing the following incidents: Plaintiff Lewis recounts an incident when he spoke with Huffman shortly after Huffman became business representative in 2000 to notify Huffman he thought there was race discrimination in Local 2's practices. (Huffman Dep. 312:3–24). In late 2001, Local 2 granted Plaintiff Booker's request for a meeting with Local 2 leadership, including Huffman, Lind, Eslinger, Alexander, Flach, Jerry Lewis, Steve Howerton ("Howerton"), Locke, John Braxton, Tim Moran, and Charlie Coats, to discuss hiring and referral practices within Local 2. (Doc. # 68, Ex. 31; Huffman Dep. 317:23 to 318:25). At the meeting, Booker raised concerns over the fairness of Local 2's referral procedures and requested Local 2 change its procedure to a "strict hiring hall," requiring dispatch of members on a first-in-first-out basis without opportunity

for solicitation or requests. (Huffman Dep. 319:10–320–25; Howerton Dep. 277:24–278:8). Local 2 leadership informed Booker the current system was fair and would not be changed. (Huffman Dep. 319:17 to 321:6; Howerton Dep. 278:4–8). Lind knows of at least three other union halls that employ a strict or mandatory hiring procedure, involving a first-in-first-out rule without solicitation or requests, successfully. (Lind Dep. 133:4 to 134:15).

Franklin alleges in 1994 he filed a formal grievance regarding a $6,000 fine Local 2's Joint Adjustment Board assessed against him for working for a non-union contractor. (Franklin Decl. ¶ 47). Franklin appealed the fine, contending he was working for a contractor not engaged in sheet metal work and that he was merely trying to make a living. *Id.* He claims the appeal under the CBA provisions was ineffective although the record shows the fine was reduced by $4,500. (Franklin Activity History, Doc. # 59, Att. # 42). Franklin admits the appeal had nothing to do with Local 2's referral procedures. (Franklin Dep. 45:12–16).

On August 27, 2002, Plaintiffs Steele and Bailey met with business representatives Alexander, Huffman, and Howerton to discuss the fact that Steele, Bailey, and other black members were unable to obtain employment through Local 2. (Doc. # 68, Ex. 32; Huffman Dep. 295:21 to 298:19; Alexander Dep. 492:13 to 493:24). Huffman informed Steele he felt Steele could not get hired because contractors were afraid Steele would sue them. (Huffman Dep. 297:23 to 300:18). Huffman also suggested Steele take journeyman updating classes to sharpen his skills but offered no other suggestions regarding how to resolve Steele's complaint. (Huffman Dep. 299:23 to 300:15).

Bailey alleges he also had discussions with Huffman, Eslinger, and Locke regarding discrimination concerns. (Bailey Resp. to Int. # 28). Local 2 official Porter determined Local 2 could do nothing to assist Plaintiffs in obtaining work. (Porter Dep. 259:2–7). According to Howerton, Local 2 could not tell contractors how to hire or how much diversity they needed. (Howerton Dep. 198:10–14; 284:7–11). Plaintiff Franklin claims Alexander told him Local 2 could do nothing to prevent discrimination because contractors can hire whoever they want under the referral procedures. (Franklin Resp. to Int. # 6).

Finally, Plaintiff Lewis alleges Cates Sheet Metal, Inc. ("Cates") dismissed him after Cates' handwriting experts decided, despite Lewis's continued denial, Lewis falsified Cates' documents to make it appear as though another employee had defaced his time card to spell out the word "N-i-g-g-e-r." (Lewis Decl. pp.8–9). Lewis alleges that, despite his request, Alexander initially refused to file a grievance against Cates until an EEOC official wrote him a letter. (Lewis Decl. ¶ 38; Lewis Dep. 364:22 to 365:3).

The arbitral body hearing the grievance in January 2003 included Local 2 officials Huffman, Jerry Lewis, Howerton, and Eslinger. (Lewis Decl. ¶ 39). Huffman had been part of a core group of employees at Cates prior to 2003. (Eslinger Dep. 339:16 to 340:17). Another panelist represented Environmental Mechanical Contractors, a Local 2 contractor with which Plaintiff Lewis had entered into a settlement agreement. (Alexander Dep. 474:19 to 475:10). In January 2004, business representative Jerry Lewis was quoted in a newspaper as saying, "The problem is blacks do not want to work." (Alexander Dep. 475:11–16; Locke Dep. 153:7–10; Huffman Dep. 346:15 to 347:6). Jerry Lewis also told Locke when first elected as a Local 2 business agent that "his car didn't go past Troost," which Locke took to mean he

wanted to avoid areas where African Americans and other minorities lived. (Locke Dep. 107:1 to 108:9).

Plaintiff Lewis did not raise any objections at the grievance hearing. (Lewis Decl. ¶ 39). However, Porter testified he did not think it was fair to have someone hear claims of racial discrimination who had made racially controversial comments. (Porter Dep. 91:22 to 92:3). The joint board hearing Lewis's grievance issued a final and binding determination Cates had not violated the CBA in dismissing Lewis. (Doc. # 58, p.29). Lewis claims Locke tried to influence him to drop the grievance against Cates, stating in part, "for every action there is a reaction." (Lewis Dep. 260:8 to 261:24).

At Plaintiffs' request, three different business managers at Local 2, Frank Barnett ("Barnett"), Porter, and Alexander, sent at least three letters to all Local 2 contractors over the last ten years reminding them of their obligation to hire workers without discriminating based on race. (Franklin Dep. 118:7–17; Steele Dep. 318:20 to 319:22). Barnett's letter concerned Local 2 contractors' practice of examining the OWL and passing over qualified minority and female members by requesting members lower on the list. (Barnett Dep. 76:4 to 77:7). Barnett testified he could tell this was a problem by looking at the OWL and, though not against Local 2 policies, that this practice was wrong and could "create the impression of prohibited discrimination." *Id.* at 78:8–22; 87:4–14; Barnett Letter. To Barnett's knowledge, no Local 2 contractor contacted him in response to his letter or changed its practices. *Id.* at 97:7–10; 103:15 to 104:19; 108:4–14; 179:1–9. Barnett maintained there was nothing Local 2 could do to remedy contractors' bypass of qualified minorities because of the procedures in place. *Id.*

Porter's letter stated contractors' practices created the "perception that an overusage of requests by name discriminates against minorities and females" but Porter maintained contractors "could do what they wanted to do as far as the OWL was concerned." (Porter Dep. 103:17 to 104:10; 106:1–3). Franklin testified Kansas City's equal employment agency had also sent letters to Local 2 contractors regarding their failure to hire African–American members. (Franklin Dep. 118:3–4).

Since 2000, each Plaintiff was unemployed for extended periods of time, often more than six months and sometimes for an entire year, while remaining on the OWL. (Doc. # 68, pp.68–76). Although white Local 2 members Chastain, Gregory Davison ("Davison"), Howerton, and Barnett spent little-to-no time on the OWL from 2000 to 2006, African–American members John Braxton, Frank Jones, Bryan Jones, Locke, and Michael McDaniel similarly spent little-to-no time on the OWL. (Chastain Dep. 15:20 to 16:3; Davison Dep. 12:24 to 13:5; 15:4–6; 23:5–11; Howerton Dep. 43:16 to 44:7; Barnett Dep. 45:15 to 47:25; Doc. # 83, Att.## 34, 41–43).

Local 2 justifies its reaction to Plaintiffs' complaints with claims Plaintiffs' unemployment resulted from barriers Plaintiffs erected themselves and cites the following conduct: Between 1997 and 2005, Steele entered into settlement agreements with seven sheet metal contractors—Cates, All–Temp Industrial, A. Zahner Co., Baker–Smith Sheet Metal, Sheet Metal Contractors Co., Seibolt–Swinney Sheet Metal, Inc., and Edwards McDowell—to resolve complaints of discrimination. (Steele Dep. 83:16 to 84:12). The agreements included monetary compensation and Steele's agreement he would not seek future work with those contractors. (Steele Decl. ¶ 46) Steele admits Cates is one of the larger

Local 2 contractors that employs more members than other contractors. (Steele Dep. 84:13–21).

Plaintiff Franklin entered into similar agreements with A. Zahner Co., Baker–Smith Sheet Metal, All–Temp Industrial, Sheet Metal Contractors Co., and Seibolt–Swinney Sheet Metal, Inc. (Franklin Decl. ¶ 46). Franklin has also indicated in signing the OWL that at times he would not work in Local 2 geographical areas 2, 3, 4, or 5. (Franklin Dep. 366:1 to 388:25).

Lewis entered into similar agreements with Seibolt–Swinney Sheet Metal, Inc. and Edwards McDowell. (Lewis Decl. ¶ 46). Bailey entered into an agreement with Seibolt–Swinney Sheet Metal, Inc. (Bailey Decl. ¶ 28). Each of these agreements resolved complaints of discrimination. *Id.* at ¶¶ 25–27.

At one point, Cates dismissed Plaintiff Franklin for allegedly poor work performance. (Franklin Resp. to Int. # 13). Franklin sued Cates for failing to re-employ him. (*Franklin v. Cates Sheetmetal Indus., Inc.,* Case No. 01–1019–CV–W–FJG, Doc. # 72). On summary judgment, this Court found Cates had legitimate non-discriminatory reasons for declining to re-hire Franklin. *Id.* Franklin contends he developed lupus which doctors mis-diagnosed but eventually resolved with proper treatment. (Franklin Decl. ¶¶ 49–50).

Franklin received 33 calls from Local 2 between 2000 and 2005, though he disputes all the calls were related to employment opportunities. (Doc. # 68, p.20). On at least two of those occasions, Franklin turned down the jobs offered. *Id.* at p. 20. Franklin did not return the calls on 28 occasions. *Id.* At one point, Franklin filed discrimination charges against Local 2 contractor Semco when Semco did not offer him employment although he acknowledged he probably would not have accepted a job with Semco because of the required travel distance of about 100 miles.

(Franklin Dep. 396:3–16). Franklin also refused to work in trades other than the sheet metal industry, particularly as a boilermaker because of reduced pay rates and poor working conditions. (Franklin Decl. ¶ 27; Howerton Dep. 70:4 to 71:18). Franklin is aware of Local 2's appeal provision for its referral procedure but does not recall filing an appeal, citing Local 2's statements Local 2 contractors could hire whoever they wanted. (Franklin Dep. 45:2–16).

Plaintiff Steele received approximately 17 calls from Local 2 between 2000 and 2005. (Doc. # 68, pp. 20–21). Steele did not return messages on at least five of the 17 occasions. *Id.* at 21. On two of the occasions, he did not report to the jobs to which he had been referred. *Id.* Steele had to turn down referrals on at least two occasions due to settlement agreements with the contractors in question. *Id.* At least seven of Local 2's referrals resulted in employment for Steele. *Id.*

Local 2 referred Steele to work for Butzer Company at one point and Butzer fired Steele for engaging in a physical altercation with an African–American foreman on the job. (Howerton Dep. 156:7 to 159:10). Steele claimed he immediately reconciled but was nonetheless fired. (Steele Decl. ¶ 38). Steele complained to Local 2 officials. *Id.* Howerton spoke with Butzer Company representatives to investigate and informed Steele there was nothing Local 2 could do to get his job back. (Howerton Dep. 155:22 to 157:24).

On another occasion, Eslinger advanced funds to Steele while Steele was working at an out-of-town job in order to pay Steele's union dues and prevent lapse of his membership. (Steele Dep. 207:3–16). Another time, Steele advised Huffman he was interested in serving as steward and Huffman appointed him as steward. (Huffman Dep. 152:14–24; Steele Resp. to

Int. # 34). Steele contends other Local 2 officials were extremely upset with Huffman for appointing him as steward even for only one-week jobs. (Steele Dep. 350:3–9; 352:17–20). Flach remembers telling Steele to apply and look for work in Flach's area at one point because he believed work would soon be coming to the area. (Flach Dep. 202:21 to 203:4). Steele admits he did not solicit employment from 64 of 95 available Local 2 contractors, but chose instead to rely on the referral process and the OWL. (Steele Dep. 266:1–16; Doc. # 68, p.22)

From 2000 through 2005, Local 2 called Plaintiff Lewis at least 27 times. (Lewis Call History, Doc. # 59, Att. # 46). Lewis turned down at least one referral, did not return numerous calls, and was successfully referred approximately 9 times. *Id.* Lewis placed himself on will call from May 17, 2001 to October 3, 2001, meaning he did not want to be called for work during that period. *Id.*

On March 30, 2005, Barnes and Dodge terminated Lewis over a dispute regarding Lewis' ability to return to work on a specific date after suffering medical problems from working conditions. *Id.*; Lewis Decl. ¶ 44. Lewis alleges Barnes and Dodge's discovery he had sued Local 2 and other contractors motivated the termination. (Lewis Dec. ¶ 54). Lewis did not sign the OWL again until three months later. (Lewis Call History, Doc. # 59, Att. # 46).

Around November 2001, Local 2 referred Lewis to an out-of-town job with Butzer Company. *Id.*; Howerton Dep. 236:2–9. Approximately two months into the job, Lewis injured his back and neck in a lift injury. (Lewis Decl. ¶ 36; Lewis Dep. 401:3–19). Butzer offered Lewis light-duty work on his return, but required him to return to full duty after one of Butzer's doctors concluded three weeks was sufficient recovery time. (Lewis Decl. ¶ 36). Lewis requested more recovery time but Butzer terminated him when three weeks had passed. *Id.* Though Lewis did not seek help from Local 2 for reinstatement, Howerton was aware of the situation and had spoken to Lewis about it. (Howerton Dep. 258:23 to 260:13).

At another time, Global fired Lewis after only two days of work alleging poor work performance. (Lewis Dep. 394:3–22). Lewis, along with two other minority employees, approached Huffman at Local 2 and requested he intervene. *Id.* at 397:7–18. When Porter contacted Lewis to inform him Local 2 had succeeded in having him reinstated with Global, Lewis refused to return in part because Local 2 could not solicit a public apology from Global. *Id.* at 398:12 to 401:2. Around the time Lewis rejected the opportunity for reinstatement, Franklin continued to work for Global and earned between $45,000 and $48,000 on that job over a ten-month period. (Franklin Dep. 113:5–22).

On another occasion, Lewis and Steele complained to Flach about Dragoo Sheet Metal's ("Dragoo") dismissal of them from a job at Northwest Missouri State University. (Lewis Dep. 251:21 to 253:7; Steele Dep. 46:2–25). Although denied by Lewis and Steele, Flach alleges a general contractor requested Dragoo, a subcontractor on the job, terminate "two African American gentlemen" from the job because they were not productive. (Flach Dep. 207:2–24). Steele and Lewis claim on the day Dragoo laid them off for alleged inadequate performance they had reported to a superintendent that a Caucasian man told a racial joke on the job. (Steele Decl. ¶¶ 32–35; Lewis Decl. ¶ 41).

Steele and Lewis also complained about lack of travel pay. (Flach Dep. 211:15 to 212:16). Flach communicated the complaints to Dragoo's owner and helped negotiate a settlement that included $700 payment in return for waiver of claims and

an agreement not to work for Dragoo again, which Plaintiffs rejected. *Id.* at 213:4 to 215:5. Instead, Steele and Lewis sought their attorney's assistance and achieved reinstatement with Dragoo. (Lewis Decl. ¶ 42; Steele Decl. ¶ 36).

Lewis also alleged Local 2 contractors denied him overtime work in two instances. (Lewis Dep. 336:1 to 349:25; Doc. # 68, p.53). Two of those who were awarded more overtime than Lewis were African American. *Id.* Lewis filed formal grievances nearly a year after the incidents and Local 2 investigated. *Id.* He did not solicit work from 47 of 84 contractors available, but rather primarily relied on referrals through signing the OWL. (Doc. # 59, p.22; Lewis Decl. ¶ 6).

Local 2 called Plaintiff Booker 33 times between January 2000 and December 2005. (Booker Call History, Doc. # 59, Att. # 44). With respect to 22 of the 33 calls, Local 2's records reveal no return call. *Id.* Local 2's records indicate Booker turned down jobs on five occasions, though Booker does not recall turning down offers. *Id.;* Booker Decl. ¶ 12. On five occasions, Local 2 successfully referred Booker. (Booker Call History, Doc. # 59, Att. # 44).

Booker placed himself on will call status from April 23, 2000 to May 30, 2000 and from February 18, 2003 until September 4, 2003 which means Local 2 likely would not have called Booker during those times. *Id.* Local 2's records show Booker did not report to a job at Global in February 2000. *Id.* Local 2 contractors also discharged Booker from a job on two occasions due to a positive drug test but reinstated Booker at one of the jobs after he provided evidence of his prescription medication. (Booker Dep. 126:1 to 127:17).

At one point when Booker complained to Local 2 about a contractor's lack of safety equipment, the equipment was provided later that day. (Booker Decl. ¶ 37; Book-

er Dep. 87:2–24). Booker also filed discrimination and retaliation charges against Barnes and Dodge and Local 2 for Barnes and Dodge's failure to hire him. (Booker Dep. 89:2–24). Booker speculated Barnes and Dodge may have been upset because he had quit a job with them in the past and had missed time due to back problems. *Id.;* Booker Decl. ¶ 37.

Another time, Alexander intervened on behalf of Booker to persuade Cates to reinstate Booker when he was experiencing health problems that affected his attendance. (Booker Dep. 129:2 to 130:12). Huffman also referred Booker to work with Dale Crook at one point. *Id.* at 155:24 to 156:15. Booker retired from the sheet metal trade in the Spring of 2004 and was last physically able to work in September 2003. (Booker Decl. ¶¶ 1, 4; Booker Dep. 107:25 to 108:7).

Local 2 called Plaintiff Bailey at least 15 times between February 2000 and June 2002. (Bailey Call History, Doc. # 59, Att. # 43). Its records show Bailey did not return nine of those calls. *Id.* Bailey turned down referrals at least twice because the work was short term or out of town. *Id.;* Bailey Decl. ¶ 10. Bailey indicated, when filling out his OWL information, he would not work in another trade or craft. (Bailey Dep. 236:20 to 238:5). He did not solicit or apply for work with 78 of the 84 available contractors since January 2000 but rather informed Local 2 of his availability by signing the OWL. (Bailey Dep. 103:1 to 154:25; Bailey Decl. ¶ 4).

Barnes and Dodge employed each Plaintiff at some point and identified only Bailey as one who performed at a level that would allow an employer to make money by hiring him. (Phelps Dep. 132:3 to 133:12). At least two others disagreed with Barnes and Dodge's assessment with regard to each Plaintiff's performance. (Howerton Dep. 22:5–9; Davison Dep.

76:25 to 77:18; Chastain Dep. 222:16–21; Eslinger Dep. 296:17 to 297:4).

In opposing Local 2's allegations Plaintiffs were unresponsive to employment opportunities, Plaintiffs' expert, Gutman, compared call responsiveness of African–American members, including Plaintiffs, to that of all other members and found no significant difference. (Gutman Decl. ¶ 33). Further, Plaintiffs generally allege many of the calls from Local 2 which they did not return or answer were (1) multiple calls for the same job, (2) calls for out-of-town work with increased travel expenses, no travel stipend, and lower pay rates, (3) calls for short-term work which would risk missing out on better opportunities and health insurance, (4) calls for boilermaker work rather than sheet metal work, (5) calls for work with contractors with whom Plaintiffs had entered into settlement agreements prohibiting employment, and/or (6) calls when Plaintiffs were already working for or were about to begin work for another Local 2 contractor. (Franklin Decl. ¶¶ 10–24, 26; Steele Decl. ¶¶ 10–17, 19; Lewis Decl. ¶¶ 10–22, 24; Booker Decl. ¶¶ 10–17, 19; Bailey Decl. ¶¶ 7–10, 12).

Though Gutman's report shows some of the contractors with whom Plaintiffs settled did hire a significant number of African–American members, Plaintiffs allege the settlement agreements they entered did not impede their ability to get hired but simply maintained the status quo as those contractors were not hiring African–American members as a general matter. (Steele Decl. ¶¶ 20, 22; Steele Resp. to Int. # 10; Franklin Decl. ¶ 46; Franklin Dep. 81:14–16). Further, ninety-six of the 154 Local 2 contractors that provided work to Local 2 members from 2000 to 2006 hired no African–American members over that seven-year period. (Gutman Decl. ¶ 12).

Porter and Howerton acknowledge white members turn down jobs at a similar rate to African–American members. (Porter Dep. 241:2–6; Howerton Dep. 250:13–16). Plaintiffs also point to Porter's testimony that issues regarding lack of productivity are no more prevalent among African–American members than white members. (Porter Dep. 266:12–23). Eslinger admitted he would hire all five Plaintiffs based on their qualifications if he had the ability to hire. (Eslinger Dep. 296:17 to 298:15). With limited exceptions, the 33 termination slips relating to Plaintiffs show they were laid off due to force reductions and that those contractors would rehire Plaintiffs. (Termination Slips, Doc. # 68, Ex. 33). Further, although Local 2 alleges Plaintiffs unreasonably restricted their geographic preference for employment, Steele, Lewis, Bailey, and Booker state they accepted work to varying degrees and on different occasions in Oklahoma City, OK, Nevada, MO, St. Louis, MO Knobnoster, MO, Newark, NJ, St. Mary, KS, Maryville, MO, Pittsburgh, KS, Omaha, NE, Fort Calhoun, NE, and Texas. (Steele Decl. ¶ 19; Steele Resp. to Int. # 15; Lewis Decl. ¶ 24; Booker Decl. ¶ 19; Bailey Decl. ¶ 12).

Franklin recalls applying multiple times for employment with between 13 and 16 contractors since January 1, 2000. (Franklin Resp. to Int. # 7; Franklin Dep. 87:16–25). Only two contractors hired him through solicitation during that period. (Franklin Decl. ¶¶ 29–41; 36–37; Franklin Resp. to Int. # 7; Franklin Dep. 62:17–22). From 2004 to 2005, one contractor requested Franklin for work. (Franklin Decl. ¶ 38). Franklin also attended classes to obtain a supervisor's license and a course on energy management training without improving his employment prospects. *Id.* at ¶ 40. He claims knowledge of at least 13 times when the referral procedure allowed Local 2 contractors that do not hire African Americans to hire

workers below him on the OWL. (Franklin Dep. 30:15–22; Franklin Resp. to Int. # 7).

In addition to posting his name on the OWL, Steele applied for work with Local 2 contractors at least 23 times since 2001 and three contractors hired him as a result of his solicitation efforts. (Steele Resp. to Int. ## 6–7, 12; Steele Decl. ¶¶ 23–48). Franklin and Steele also allege they visited Local 2's hall two to three times per week to pursue work without success. (Franklin Decl. at ¶ 39; Steele Decl. ¶ 49).

Lewis specifically applied for employment on at least five occasions since 2000, in addition to posting his name on the OWL, and successfully solicited work with three Local 2 contractors during that time. (Lewis Decl. ¶¶ 25–27, 29–32). Lewis alleges he personally contacted Local 2 contractors and visited their work locations to solicit employment. (Lewis Resp. to Int. # 14).

Since 2000, Booker successfully solicited employment with Local 2 contractors on five occasions. (Booker Decl. ¶ 29). In addition to posting his name on the OWL, Booker applied for employment with Local 2 contractors at least five other times without success. *Id.* at ¶¶ 21–26. Booker also recalls he personally contacted Local 2 contractors by phone and visited Local 2's hall at least once a week when unemployed. *Id.* at ¶¶ 26–27; Booker Resp. to Int. # 14; Booker Dep. 40:21 to 41:6.

In addition to posting his name on the OWL when unemployed, Bailey applied for work with Local 2 contractors at least eight times since 2000 and was hired only once for about 120 hours. (Bailey Resp. to Int. ## 7, 14; Bailey Decl. ¶¶ 16–19). He also successfully solicited work on three other occasions but states he was successful only because he initiated charges of discrimination for failure to hire after submitting his application. (Bailey Decl. ¶ 23). For example, in 2001 or 2002, after initially applying for work at Barnes and Dodge and experiencing a delay in hiring, Bailey began to initiate discrimination charges. *Id.* ¶¶ 20–21, 23. Bailey contends his actions caused Barnes and Dodge to subsequently employ him for approximately nine months. (Bailey Dep. 115:1–10). Cates has employed Bailey since February 2004. (Bailey Decl. ¶¶ 20–21; Bailey Dep. 19:24 to 20:9; 23:9–20).

Plaintiffs' additional complaints about Local 2's conduct include the following: Plaintiff Franklin has complained of travelers from other unions refusing to transfer into Local 2 while working in its territory and keeping him from gaining employment as a result, particularly with contractor Global. (Franklin Dep. 362:3 to 363:25). Franklin admitted that at the time some travelers were working for Global within Local 2 territory, employment at Local 2 was high and few members were available to fill open positions. *Id.* at 364:1–13.

At one point Huffman advised Plaintiff Bailey to go to Oklahoma to secure work; Bailey was unable to obtain employment although he made the trip and accuses Huffman of discrimination. (Bailey Dep. 160:2–24). Bailey admits he had no facts beyond speculation to show Huffman directed him to go to Oklahoma knowing no employment would result. *Id.* at 169:2–22.

Plaintiff Lewis alleges that in 2000 or 2001 Alexander and Porter failed to support his discrimination claims adequately before the Kansas City Human Rights Commission through their inadequate testimony and correspondence. (Lewis Dep. 503:8 to 507:20). Lewis made similar allegations regarding Huffman. *Id.* at 510:8 to 512:19.

Plaintiff Franklin testified Local 2 should increase African–American membership by

> "not allowing contractors to fire and not hire them. Give us an equal opportunity, treat people like human beings, …

"[b]e more responsive to the situation that black workers are in at the Union, ... bring in more [African Americans]," and "make sure the ones that come in make it through.... They should take a more positive role...."
(Franklin Dep. 241:6–23).

Plaintiffs Booker, Franklin, Lewis, and Steele also note they each have filed charges against various Local 2 contractors with the Office of Federal Contract Compliance alleging noncompliance with minority hiring quotas for federal contracts. (Steele Dep. 197:14–19; Booker Dep. 80:25 to 81:11; Franklin Dep. 148:25 to 149:2; Lewis Dep. 129:13–24; Doc. # 59, Att. ## 49–51).

Plaintiffs allege numerous other instances when they were on the OWL and white Local 2 members passed them over, when Local 2 contractors laid them off and replaced them with white members, when Local 2 contractors refused to hire them when solicited, when Local 2 contractors discriminated in other ways based on race, and when Local 2 was unresponsive to complaints; some instances the record supports, many it does not. (*See* Doc. # 69). Plaintiffs reported few of the instances to Local 2 officials, but Chastain acknowledged Local 2 could have learned of minority hiring problems through Local 2 records. (Chastain Dep. 166:3 to 167:4).

Local 2 counters with evidence it has accommodated its minority members, stating Alexander appointed Locke, an African American, as a steward approximately 12 years ago. (Locke Dep. 32:1–25; Alexander Aff. ¶ 20). Eslinger invited Locke to run on the election ticket with him and others in 1997. (Locke Dep. 66:1 to 69:24). Locke served a three-year term as trustee and two three-year terms as a member of Local 2's executive board. *Id.* John Braxton, an African American and skilled sheet metal worker, has been a member of Local 2's executive board for ten years. (Alexander Aff. ¶ 22).

Local 2 also recruits minority candidates to enter the sheet metal apprenticeship program by having Local 2 representatives attend job fairs, visit high schools, advertise in minority-read newspapers, and participate in Project Prepare which provides job training for disadvantaged individuals. (Howerton Dep. 287:15–21; Lind Dep. 53:5 to 61:25; Tanner Dep. 17:17 to 18:25). However, Locke testified Local 2 had problems with recruitment because the majority of minorities live in the inner city and the majority of members in official Local 2 positions live in the suburbs. (Locke Dep. 126:23 to 127:11).

President Lind believes African Americans are appropriately represented in Local 2. (Lind Dep. 83:23 to 84:20; 88 25 to 90:9). Local 2 records from 2005 to 2006 show monthly unemployment rates were lower among African–American members than Caucasian members in the majority of months. (Employment Records, Doc. # 59, Att. # 61). Nevertheless, beginning in late 2001, each Plaintiff filed joint discrimination charges against Local 2 and various Local 2 contractors with the EEOC alleging they were not hired because of race and were retaliated against for prior discrimination charges. (Doc. # 59, pp.40–42; Doc. # 68, pp. 49–50).

### D. Plaintiffs' Retaliation Claim

Each month Local 2 posts bills due for payment in the union hall and followed such procedure with regard to bills due to Plaintiffs' claims against Local 2. (Booker Dep. 121:1 to 123:22). The posted notices specifically named Plaintiffs in connection with the expenses. (Alexander Dep. 548:10–23). Flach did not know whether it was normal for Local 2 to post the name of a member in connection with a legal ex-

pense but thought that it had occurred before. (Flach Dep. 181:12–21).

The Sheet Metal Workers International Association's Constitution and Ritual requires Local 2 to notify members of any expenses before a discussion and vote on payment of the expenses but does not expressly require a member's name be posted or read in association with a legal bill. (Doc. # 68, Ex. 41, Art. 10, § 3(a)). Nevertheless, Davison read Plaintiffs' charges against Local 2, including Plaintiffs' names, at Local 2 membership and executive board meetings. (Davison Dep. 133:1 to 135:9). Davison could not recall ever before reading names and charges of discrimination at Local 2 meetings. *Id.* at 142:8–23.

Alexander and Lind acknowledged Local 2 could communicate with its members about the hiring of legal counsel without disclosing the names of the individuals involved. (Alexander Dep. 548:10–22; Lind Dep. 158:8–19). Eslinger and Alexander admitted Local 2 continued to read and post Plaintiffs' names in connection with the legal bills at meetings after the EEOC requested they desist from including the names. (Alexander Dep. 549:10 to 550:25; Eslinger Dep. 332:1 to 333:4). Lind admitted some contractors might hesitate to hire members publicly identified by name as having brought discrimination charges against Local 2. (Lind Dep. 159:12 to 160:17). He agreed with the decision to eventually remove the names from the posted bills. *Id.*

One such meeting of Local 2's general membership at which Davison read Plaintiffs' charges and names occurred on January 14, 2002. (Union Minutes, Jan. 14, 2002; Chastain Dep. 127:21–22; Davison Dep. 128:24–25). All but two Local 2 officers were present at the meeting and 79 Local 2 members attended. *Id.* Similar meetings at which Davison read Plaintiffs' names and charges occurred on April 8,

2002; September 9, 2002; October 4, 2002; January 9, 2003; June 9, 2003; and January 12, 2004, each of which Local 2 officers and between 69 and 146 members attended. (Union Minutes, April 8, 2002, Sept. 9, 2002, Oct. 4, 2002, Jan. 9, 2003, June 9, 2003, Jan. 12, 2004; Davison Dep. 153:8–9; 154:8–10; 166:24–25; 167:1–3; 163:10–22). Local 2 states the practice of posting legal bills in the union hall existed long before Plaintiffs filed the instant charges. (Eslinger Dep. 327:19–22).

Plaintiffs testify they have experienced animosity from other Local 2 members as a result of their charges against Local 2. (Lewis Decl. ¶ 54; Booker Decl. ¶ 43; Bailey Decl. ¶ 33). Locke observed Plaintiffs' association with this lawsuit has a negative impact on Plaintiffs' ability to obtain employment and other African–American members fear association with the lawsuit because of this impact. (Locke Dep. 215:22 to 216:18). Howerton testified a Local 2 contractor has the right not to hire a Local 2 member after that member has filed a discrimination complaint against it. (Howerton Dep. 255:12–25).

Steele filed his first charges against Local 2 for which he received a right-to-sue letter for this litigation on January 4, 2002. (Steele Disc. Charge, Doc. # 68, Ex. 42). Franklin filed his first timely charges against Local 2 for which he received a right-to-sue letter for this litigation on December 12, 2001. (Franklin Disc. Charge, Doc. # 68, Ex. 44). Booker filed his first charges against Local 2 for which he received a right-to-sue letter on December 29, 2001. (Booker Disc. Charge, Doc. # 60, Ex. 19). Bailey filed his first charges against Local 2 for which he received a right-to-sue letter on August 22, 2002. (Bailey Disc. Charge, Doc. # 68). Lewis filed his first charges against Local 2 for which he received a right-to-sue let-

ter on January 4, 2002. (Lewis Disc. Charge, Doc. # 60, Ex. 25).

After Plaintiffs filed charges against Local 2 with the EEOC, the EEOC made various findings of intentional discrimination and issued a final Notice of Right to Sue with regard to Plaintiffs on Oct. 6, 2005. (July 12, 2005 EEOC Determination; Oct. 6, 2005 EEOC Notice of Right to Sue). Davison recalls Local 2 conducted no investigation in response to Plaintiffs' EEOC charges nor took any steps to ensure fair treatment for minority members. (Davison Dep. 76:1–8; 96:6–15). Huffman confirms Local 2 did not take any action in response to Plaintiffs' EEOC charges on Alexander's orders. (Huffman Dep. 308:19 to 309:25). After extensive discovery, Local 2 and Plaintiffs filed the instant Motions.[2]

## II. Standard

Plaintiffs and Local 2 filed their Motions for Summary Judgment pursuant to Rule 56. Rule 56 provides a court should grant summary judgment if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Genuine issues of material fact remain if sufficient evidence exists for a reasonable jury to find in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court reviews the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir.1997).

The moving party bears the initial burden of showing no genuine and material fact disputes remain. *Id.* If successful, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To show a genuine and material fact issue exists, the nonmoving party must go beyond the pleadings and allege specific facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1988). Conclusory statements and general denials are not sufficient to overcome summary judgment. *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir.1972) *citing First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). A court should apply Rule 56 "to isolate and dispose of factually unsupported claims." *Prudential Ins. Co.*, 121 F.3d at 366.

## III. Analysis

### 1. Statute of Limitations

██ In cases such as Plaintiffs', 42 U.S.C. § 2000e–5(e)(1) requires a plaintiff to file an administrative charge with the EEOC within 300 days of an employer's discriminatory conduct.[3] Where multiple plaintiffs in the same suit who are similarly situated allege the defendant subjected them to the same alleged discriminatory treatment in a continuous manner, courts in the Eighth Circuit have found it is unnecessary for each plaintiff to individual-

---

2. The Court notes Plaintiffs allege the elements for a class action in their Complaint. (Compl.). Because Plaintiffs have filed no formal motion to certify a class and the parties have filed no briefs on the issue, the Court will not address class certification at this time.

3. If a plaintiff files timely administrative charges and wishes to proceed by filing a claim under 42 U.S.C. § 1981, he or she must do so within five years from the accrual of the cause of action. *Harris v. Norfolk & W. Ry. Co.*, 616 F.2d 377, 379 (8th Cir.1980) (citation omitted).

ly file timely administrative charges. *Allen v. Amalgamated Transit Union Local 788*, 554 F.2d 876, 882–83 (8th Cir.1977); *see also Trbovich v. Ritz–Carlton Hotel Co.*, 920 F.Supp. 1030, 1033 (E.D.Mo.1995) *and Mathers v. Northshore Mining Co.*, 217 F.R.D. 474, 488–89 (D.Minn.2003) (citation omitted). Courts refer to this rule as the "single-filing" rule. *Trbovich*, 920 F.Supp. at 1033.

Here, each Plaintiff has filed similar charges of race discrimination with respect to aspects of their employment and Local 2's referral procedures. All the alleged acts occurred within the same time frame and each claim relates to the same discriminatory treatment. The single-filing rule is therefore appropriate.

■■■ When the single-filing rule is applicable, it is reasonable to refer to the earliest timely-filed administrative charge to identify the earliest acts a court can consider. *See Clayborne v. Omaha Pub. Power Dist.*, 211 F.R.D. 573, 588–89 (D.Neb.2002). In this case, the parties agree Plaintiff Franklin filed his first timely administrative charge with the EEOC on December 21, 2001. It is therefore appropriate under the single-filing rule for the Court to consider discrete allegations against Local 2 from any Plaintiff occurring after February 15, 2001—300 days before December 21, 2001—with respect to Plaintiffs' disparate treatment/intentional discrimination claim [4].

Plaintiffs contend the Court can consider Local 2's conduct occurring during 2000 and the beginning of 2001 as well through application of the continuing-violation doctrine. In *Madison v. IBP, Inc.*, 330 F.3d 1051, 1056–57 (8th Cir.2003), the Eighth Circuit Court of Appeals discussed a recent United States Supreme Court ruling

in which the Court clarified application of the continuing-violation doctrine in Title VII discrimination cases. The Eighth Circuit noted the Supreme Court's precedent prohibited a plaintiff from recovering for "discrete retaliatory or discriminatory acts (such as termination, refusal to hire, or failure to promote)" if claims relating to those acts were not filed within the limitations set for the administrative filing. *Id.* at 1056 (citation omitted). On the other hand, if the nature of the claims involved repeated conduct, a plaintiff can recover for any period within which the acts occurred as long as any act which was part of the claim occurred within the applicable time limitation. *Id.* at 1057 (citation omitted).

Here, Plaintiffs' claims against Local 2, at least with respect to their disparate impact claim, in the main refer to Local 2's continued refusal to address or remedy allegedly discriminatory referral policies. In the Courts' view, Plaintiffs' inclusion of discrete allegations against individual contractors regarding failure to hire, failure to promote, or wrongful termination demonstrate the alleged product of Local 2's maintenance and application of its referral procedures and are not the basis for Plaintiffs' disparate impact claim. As such, Plaintiffs' disparate impact claim against Local 2 involves primarily the continuous act of maintaining the referral procedures. Because part of Local 2's conduct with regard to the referral procedures occurred within the 300 days preceding the first timely-filed claim, the Court can consider the referral procedure's implementation during 2000 and the beginning of 2001 with respect to the disparate impact claim.

---

**4.** Disparate treatment claims require a plaintiff to show intentional discrimination on the part of the defendant. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135, 120

S.Ct. 2097, 147 L.Ed.2d 105 (2000). The Court will therefore use the terms "disparate treatment" and "intentional discrimination" interchangeably.

In sum, the Court cannot consider discrete discriminatory acts such as refusal to hire, refusal to promote, or termination occurring before February 15, 2001 but can consider Local 2's maintenance and refusal to amend its referral policies beginning in 2000.

### 2. Local 2's Motion for Summary Judgment with Regard to Disparate Treatment

Intentional discrimination claims against unions and union contractors involve separate and distinct analysis. *See Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 832 (8th Cir.2002). In 42 U.S.C. § 2000e–2(c), Congress made it unlawful for labor organizations

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.[5]

On the other hand, a *prima facie* race discrimination case against an employer under 42 U.S.C. § 1981 ("Title VII") requires a plaintiff prove (1) he is a racial minority, (2) he applied for a job for which he was qualified and for which the employer was seeking applicants, (3) the employer did not hire him despite his qualifications, and (4) after rejection, the position remained open and the employer continued to seek applicants with qualifications equivalent to the plaintiff's. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "The burden of establishing a prima facie case of disparate treatment [against an employer] is not onerous." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this standard, a plaintiff must show evidence sufficient for a reasonable jury to find "by a preponderance of the evidence that [they] applied for an available position for which [they were] qualified, but [were] rejected under circumstances which give rise to an inference of unlawful discrimination." *Id.*

■Assuming Local 2 contractors unlawfully discriminated for purposes of this claim, Local 2 contends Plaintiffs cannot hold it liable under these standards. *Thorn* describes three of the circumstances in which a union can be liable either for its own or an employer's unlawful discrimination. *Thorn*, 305 F.3d at 832 (citations omitted). According to *Thorn*, a union can be liable as follows: (1) if "it causes or attempts to cause the employer to discriminate," (2) if it "purposefully acts or refuses to act in a manner which prevents or obstructs a reasonable accommodation by the employer," or (3) if it " 'pursue[s] a policy of rejecting disparate-treatment grievances' meant to vindicate employee rights protected by Ti-

---

**5.** This provision includes language that would forbid both intentional and unintentional discrimination on the part of a union. In discussing disparate treatment and fair representation issues, only those parts that forbid intentional discrimination are relevant. The Court separately considers unintentional discrimination in its discussion of Plaintiffs' disparate impact claim below.

tle VII." *Id.* Further, to prevail on a § 1981 claim of this variety, "a plaintiff must prove discriminatory intent." *Barge v. Anheuser–Busch, Inc.*, 87 F.3d 256, 258 (8th Cir.1996) *citing Greenwood v. Ross,* 778 F.2d 448, 456 (8th Cir.1985).

■ The first two circumstances, by their express terms, refer to instances where a union affirmatively acts to either obstruct an employer's attempt to accommodate union members or acts to facilitate an employer's discrimination. For liability under those circumstances, the union must have itself instigated unlawful discrimination or actively supported the employers' discriminatory acts. *Eliserio v. United Steelworkers of Am. Local 310,* 398 F.3d 1071, 1076–77 (8th Cir.2005) (citation omitted). However, in relation to a disparate treatment claim, a union "has no affirmative duty under Title VII to investigate and take steps to remedy employer discrimination." *Id.*

■ The record here shows no basis for Plaintiffs to impose liability on Local 2 under the first two *Thorn* criteria. Rather than intentionally causing Local 2 contractors to discriminate, Local 2 officials sent letters reminding contractors of their obligation to hire without discrimination. Local 2 officials also responded to Plaintiffs' various complaints of contractor misconduct by attempting to negotiate resolutions, often successfully. Local 2 was generally responsive to Plaintiffs' complaints, ensuring prompt provision of safety equipment, filing grievances when requested, and successfully referring Plaintiffs on multiple occasions. Although Local 2 posted the OWL in the hall in a manner that

allowed Local 2 members and contractors to view it, such an action on its own raises no inference Local 2 intended to cause or instigate discrimination.[6] Similarly, Local 2's failure to refer African–American members as foreman and stewards for out-of-jurisdiction contractors is insufficient to show discrimination without evidence of the available individuals' qualifications and work record at the relevant times.

Further, the record lacks evidence Local 2 obstructed contractors' efforts to reasonably accommodate African–American members by refusing to refer minority members when requested or otherwise. Local 2 in fact referred Plaintiffs on multiple occasions, including as steward in at least two instances. At most, Plaintiffs allege Local 2 passively acquiesced in contractor discrimination consisting of passing over minority candidates on the OWL by use of Local 2's facially-neutral referral procedures. As the *Thorn* court noted, a union's passive acquiescence in an employer's discrimination is not actionable under Title VII. *Thorn,* 305 F.3d at 833.

The third circumstance the *Thorn* court identified as permitting a plaintiff to hold a union liable relates to a union's lack of action or lack of adequate representation of its members in the face of an employer's acts. *Thorn,* 305 F.3d at 832–33, *citing Goodman v. Lukens Steel Co.,* 482 U.S. 656, 688–89, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). Union liability under this circumstance does not require affirmative acts but is permissible if a union neglects its duty of fair representation. *Id.*

---

**6.** Local 2 correctly points out it is generally not liable for the acts of its members in positions as foreman for Local 2 contract because its liability is governed by principles of agency law. *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 736, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In those instances where Local 2 members may have recommended employees to a contractor in an intentionally discriminatory manner, those members were acting as agents of the contractors and not Local 2. *See E.E.O. C. v. Pipefitters Ass'n Local Union 597,* 334 F.3d 656, 662–63 (7th Cir.2003).

■ "A union will be found to have breached its duty of fair representation only when its 'conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.'" *Cross v. United Auto Workers, Local 1762*, 450 F.3d 844, 847 (8th Cir.2006) (citations omitted). "[C]onduct is arbitrary if, considering all the circumstances at the time of the union's action or inaction, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Id.* (citations and quotations omitted). "'Any substantive examination of a union's performance ... must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities.'" *Id.* (citations omitted). "Mere negligence, poor judgment, or ineptitude on the part of the union is insufficient to establish a breach of the duty of fair representation." *Id.* (citations and quotation omitted).

■ Further, a fair representation claim requires a plaintiff exhaust remedies provided under the CBA. *See Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 994 (8th Cir.2006) (a plaintiff can bring a claim against a union for breach of the duty of fair representation in addition to claims against employers for breach of a CBA, "assuming the employee has exhausted his contractual grievance remedies," *citing Vaca*, 386 U.S. at 186–87, 87 S.Ct. 903 *and Waldron v. Boeing Co.*, 388 F.3d 591, 594 (8th Cir.2004)).

■ In this case, the record shows Plaintiffs generally did not file grievances with respect to contractors' conduct. On the few occasions Plaintiffs did follow the CBA's grievance procedure, Plaintiffs' evidence is not sufficient to show Local 2's representation of them was unreasonable, let alone irrational, arbitrary, discriminatory, or in bad faith. Contrary to Plaintiffs' contentions, the incident where Lewis pursued a grievance against Cates for dismissing him based on its judgment Lewis falsified documents to include a racial slur lacks evidence of bad faith or irrationality. Although Local 2 appointed Jerry Lewis to the arbitration board in that case, Jerry Lewis' racially charged comments occurred after the grievance process was complete and Local 2 had little reason not to include him on the panel at the time. Local 2 followed the procedures set forth in the CBA and the evidence shows those procedures were reasonable as opposed to arbitrary and irrational whether or not Plaintiffs approved of the result obtained.

Further, Franklin's allegations regarding his appeal of a fine for accepting non-union work defeat his allegation Local 2 was unreasonable in representing him. Not only was the appeal unrelated to race discrimination, but Local 2 reduced his fine by $4,500 or 75 percent. Even in instances where Plaintiffs requested Local 2's assistance in the absence of filing a formal grievance procedure, Local 2's conduct was reasonable.

Plaintiffs insist Local 2 should be liable under their disparate treatment claim based on the Union's implementation, administration, and maintenance of its referral procedures. However, Plaintiffs failed to separately analyze the facts of their claims under the various standards under which a defendant can be liable under Title VII for intentional discrimination or disparate treatment. With the purpose of Rule 56 in mind, that is to identify and dispose of factually unsupported claims, the Court finds Plaintiffs' broadly cast allegations do not fulfill the elements of the law with regard to disparate treatment. Under the circumstances, the Court finds no issues of material fact remain as to Plaintiffs' disparate treatment claim against Local 2 and Local 2's Motion for Summary Judgment is therefore GRANTED as to that claim.

### 3. Local 2's Motion for Summary Judgment with Regard to Disparate Impact

■ In addition to the circumstances noted in *Thorn*, a union can be liable for the disparate impact of its policies and procedures. *Donnell v. Gen. Motors Corp.*, 576 F.2d 1292, 1296 (8th Cir.1978) "[T]o establish a prima facie case of discrimination under Title VII in a case alleging disparate impact, the plaintiff must show only that the facially neutral standard in question selects applicants in a significantly discriminatory pattern." *Id.* citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *and Firefighters Inst. for Racial Equality v. City of St. Louis*, 549 F.2d 506 (8th Cir.1977), *cert. denied,* 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977). Disparate impact claims do not require proof of discriminatory motive or intent. *Id. citing Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Albemarle*, 422 U.S. at 422, 95 S.Ct. 2362; *Griggs*, 401 U.S. at 430–432, 91 S.Ct. 849, *and Firefighters Inst.*, 549 F.2d at 510. The *prima facie* case for disparate impact varies according to differing fact situations. *Id. citing Int'l Bhd. of Teamsters*, 431 U.S. at 358, 97 S.Ct. 1843; *McDonnell Douglas*, 411 U.S. at 802 n. 13; *and Williams v. Anderson*, 562 F.2d 1081, 1088 (8th Cir.1977).

■ Though a close question, Plaintiffs have established a *prima facie* case here. Plaintiffs present evidence a minority Local 2 member with average skills and work ethic could experience disparate impact under Local 2's referral procedures. Gutman's report demonstrates African–American members accrue significantly fewer hours of employment than white sheet metal workers. The report also shows a significant number of Local 2 contractors have never hired African–American members, or very few African Americans, without any consequence for their omissions under Local 2's referral policies.[7] Such statistical evidence is probative in establishing a disparate impact claim. *See Carter v. Gallagher*, 452 F.2d 315, 323 (8th Cir.1971). Whether a statistical analysis carries "the plaintiffs' ultimate burden will depend ... on the factual context of each case in light of all the evidence presented by both the plaintiff and the defendant." *Bazemore v. Friday*, 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986). "[A]s long as the court may fairly conclude, in light of all the evidence, that it is more likely than not that impermissible discrimination exists, the plaintiff is entitled to prevail."[8] *Id.* at 401, 106 S.Ct. 3000.

Local 2 representatives have also attested to the problem. Locke stated it is difficult for African–American members to gain acceptance in established Local 2 cliques. Other representatives acknowledged Local 2 contractors at least created the impression of discrimination by passing over qualified minority members in making requests for employees. Locke suggests Local 2 has a systemic problem it has perpetuated for the last 30 years which negatively impacts African–American sheet metal workers.

---

7. Though it would be impossible for each Local 2 contractor to hire one African–American member at the same time since Local 2 has only around 65 African–American members, including apprentices, it is peculiar that so many Local 2 contractors hired no African–American members over a period of many years.

8. With respect to Local 2's minority members as a whole, Local 2 has done little to dispute Plaintiffs' assertions a disparate impact exists, which, in light of the complexity of applying the well-defined parameters of statistical analysis to the uncertain variables of the workplace, weighs in favor of Plaintiffs' claims. (*See* Doc. 83, Att. # 1, pp. 128–30).

Once he has established a *prima facie* case, a plaintiff can hold a union liable for the disparate impact a selection procedure causes if the union participates in establishing and overseeing the procedure. *Donnell*, 576 F.2d at 1300. With respect to a disparate impact claim, "[l]abor unions, as well as employers, have an affirmative duty to take corrective steps and to insure compliance with Title VII ... and a union's role in ratifying a discriminatory practice could be enough to compel a finding of union liability." *Id.* (citations omitted). Even where an employer, as opposed to a union, primarily administers a selection procedure, which is not the case here, the union can be liable if it had influence over the procedures. *Id.* (citations omitted).

Although Local 2 denies it has significant influence or responsibility for the referral procedures in question, the record shows otherwise. At minimum, existence of the age discrimination provision in Article 4–8 of the CBA shows Local 2 had some power with respect to negotiating referral procedures even if the CBA, traditions of CBA interpretation, and industry practice had long utilized the procedures in dispute. President Lind testifies other union halls have in fact established procedures that differ from the procedures Local 2 administers. Further, one of the basic purposes of labor organizations is to take responsibility for advocating and establishing policies similar to those in dispute in this case. Nevertheless, before a disparate impact claim escapes summary judgment, the burden "shifts to the employer to justify the procedure by showing that it is related to safe and efficient job performance." *Allen v. Entergy Corp.*, 181 F.3d 902, 904 (8th Cir.1999) (*citing Donnell*, 576 F.2d at 1299).

In this case, Local 2 contends its referral policy that allows solicitation and requests is necessary to reward work eth-

ic, improve performance, and generate competitiveness. Without allowing solicitation or requests, Local 2 states the referral procedure would sap its members of competitive drive, encourage complacency, and reduce incentive to develop new skills. Rather than taking initiative to obtain the best jobs, members would await referral in turn from the OWL. Other courts have found similar evidence of a selection criteria's relation to safety and job performance sufficient to satisfy the defendant's burden in a disparate impact claim. *See Int'l Bhd. of Elec. Workers, AFL–CIO, Local Unions Nos. 605 & 985 v. Mississippi Power & Light Co.*, 442 F.3d 313, 319 (5th Cir.2006) (employer's offered proof increasing the competitiveness of a test score to enhance employee proficiency shows the selection criteria is both job-related and consistent with business necessity). The Court is similarly unable to deny the reasonableness of Local 2's contentions here.

"Once the [defendant] meets this burden, the plaintiff must show that an alternative selection method exists, having substantial validity and less of an adverse impact; if such an alternative exists, the employer must choose the less discriminatory method." *Allen*, 181 F.3d at 904, *citing Hawkins v. Anheuser–Busch Inc.*, 697 F.2d 810, 816 (8th Cir.1983). In this case, Plaintiffs offer credible arguments Local 2 could have hedged potential discriminatory hiring while maintaining incentive and competitiveness. Plaintiffs point out Local 2 could have allowed solicitations and requests while also referring a member from the OWL if that member has remained on the OWL for a specified extended period. Local 2 could also limit the number of times contractors could use solicitation and referral to recruit employees within a specified period. Alternatively, Local 2 could negotiate for a policy similar to the policy developed to stem age

discrimination. Multiple options for referral procedures exist between the poles of Local 2's current policy and a strict hiring hall. Local 2's Motion for Summary Judgment is therefore DENIED with respect to Plaintiffs' disparate impact claim.

### 4. Local 2's Motion and Plaintiffs' Cross–Motion with Regard to Retaliation

Title VII prohibits an employer or labor organization from retaliating against an employee who has opposed any practice Title VII makes unlawful or has "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e–3(a). A prima facie case of retaliation requires a plaintiff to prove "(1) [s]he engaged in protected conduct, (2) a reasonable employee would have found the challenged retaliatory action materially adverse, and (3) the materially adverse action was causally linked to the protected conduct." *Carpenter v. Con–Way Cent. Express, Inc.,* 481 F.3d 611, 618 (8th Cir.2007) *citing Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

In this case, each Plaintiff engaged in protected conduct when he filed charges against Local 2 and Local 2 contractors with the EEOC. Plaintiffs submit some evidence a reasonable employee would find publication and announcement of their names at Local 2 meetings materially adverse to their employment opportunities. Locke testified Plaintiffs' association with this lawsuit has a negative impact on their ability to obtain employment and other African–American members fear association with the lawsuit because of this impact. Lind also admitted some contractors might hesitate to hire members specifically identified as having brought discrimination charges against Local 2. Plaintiffs therefore sustain their burden of showing a reasonable employee would view Local 2's actions as materially adverse to his or her employment opportunities.

Further, the record has evidence of a causal link between the reading of the names and charges and the protected conduct. A temporal link between a defendant's action and the protected conduct can be sufficient to demonstrate a causal link. *See Bassett v. City of Minneapolis,* 211 F.3d 1097, 1105–06 (8th Cir.2000) *citing Mathews v. Trilogy Communications, Inc.,* 143 F.3d 1160, 1166 (8th Cir.1998) *and Keys v. Lutheran Family and Children's Servs. of Mo.,* 668 F.2d 356, 358 (8th Cir.1981). *But see Arraleh v. County of Ramsey,* 461 F.3d 967, 978 (8th Cir.2006) (temporal proximity alone generally insufficient to show pretext). Here, Local 2 read the names and charges at numerous meetings in close proximity to the times Plaintiffs filed charges.

When no direct evidence of retaliatory motive is present, retaliation claims fall under the burden-shifting framework of *McDonnell Douglas. Stewart v. Indep. Sch. Dist. No. 196,* 481 F.3d 1034, 1042–43 (8th Cir.2007). Under *McDonnell Douglas,* the defendant has an opportunity to show it had a "non retaliatory reason for the adverse employment action." *Id.* at 1043 (citations omitted). Here, Local 2 suggests its policy required it to read the charges and the names as official correspondence and to attain approval of expenditures on legal fees. Local 2 avers its Constitution and Ritual require members to vote on bill payments which in turn requires full disclosure of bills, including names. Further, Local 2 states the practice of posting legal bills with names attached in the union hall existed long before Plaintiffs filed the current charges. The Court finds Local 2's excuse a sufficient non-retaliatory reason to have read the

names and charges and posted the legal bills to satisfy Local 2's burden.

If the defendant successfully proffers a non-retaliatory reason, "the burden returns to the plaintiff who is then obliged to present evidence that (1) creates a question of fact as to whether [the defendant's] reason was pretextual and (2) creates a reasonable inference that [the defendant] acted in retaliation." *Id.* (quotation marks and citations omitted).

Plaintiffs suggest Local 2 could have and should have read the charges against Local 2 without revealing Plaintiffs names. Local 2 officials acknowledge it could have communicated the charges to Local 2 members without reading Plaintiffs' names. This evidence, however, does not suggest Local 2's contention it was required to read the names as official correspondence was pretextual and premised on a retaliatory motive.

In *Thorn*, the Eighth Circuit noted "Title VII is not 'a general civility code for the American workplace.'" 305 F.3d at 831 *citing Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). This principle applies "with at least equal force to the rough and tumble of union meetings, where members gather voluntarily to discuss controversial issues likely to provoke strong feelings and divergent views." *Id.* (citation omitted). In this case, there is no evidence any Local 2 official's commented inappropriately or publicly disparaged Plaintiffs in front of members or Local 2 contractors. There is no evidence Local 2 later refused to refer Plaintiffs or arbitrarily singled them out with regard to the referral procedures. Local 2's judgment to include Plaintiffs' names in its posting and announcement of the legal bills, even if poor judgment, is insufficient under Eighth Circuit precedent to allow Plaintiffs' retaliation claim to proceed.

In sum, the burden-shifting McDonnell–Douglas analysis shows Plaintiffs are unable to raise a question of fact as to pretext or motive for Local 2's conduct. Local 2's Motion is therefore GRANTED with respect to Plaintiffs' retaliation claim. Plaintiffs' Motion for Partial Summary Judgment on that claim is DENIED.

## CONCLUSION

Local 2 successfully establishes it is not liable under applicable standards for disparate treatment in this case. As such, Local 2's Motion for Summary Judgment is GRANTED with respect to Plaintiffs' intentional discrimination claim. On the contrary, Plaintiffs present sufficient evidence a genuine issue of material fact exists with regard to whether Local 2's referral procedures have a disparate impact on its minority members. Local 2's Motion is therefore DENIED with respect to Plaintiffs' disparate impact claim. Finally, Plaintiffs are unsuccessful in generating a genuine issue of material fact regarding whether Local 2 acted in retaliation to Plaintiffs' claims by posting legal bills containing Plaintiffs' names and reading Plaintiffs' names in association with the bills and charges at Local 2 meetings. Local 2's Motions for Summary Judgment is therefore GRANTED with respect to Plaintiffs' retaliation claim. Plaintiffs' Motion is DENIED.

**IT IS SO ORDERED.**