# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 06-1870

———————

Jane E. Stewart,                    *
                                    *
      Plaintiff-Appellant,         *    Appeal from the United States
                                    *    District Court for the
    v.                             *    District of Minnesota.
                                    *
Independent School District No. 196,   *
                                    *
      Defendant-Appellee.          *

———————

Submitted: November 14, 2006
Filed: April 6, 2007

———————

Before LOKEN, Chief Judge, LAY[1] and MELLOY, Circuit Judges.

———————

MELLOY, Circuit Judge.

Jane Stewart appeals the district court's[2] grant of summary judgment on claims under the anti-retaliation provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 623(d) ("ADEA") and Americans with Disabilities Act, 42 U.S.C. §

———————

[1]The Honorable Donald P. Lay took permanent disability retirement on January 3, 2007. This opinion is being filed by the remaining judges of the panel pursuant to 8th Cir. R. 47E.

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota, adopting the report and recommendation of Janie S. Mayeron, United States Magistrate Judge for the District of Minnesota.

12203(a) ("ADA").  She also seeks review of the district court's refusal to exercise supplemental jurisdiction over Minnesota statutory and common-law claims.  We affirm the judgment of the district court.

I.    Background

Independent School District No. 196 ("the District") is Minnesota's fourth largest school district.  Starting in 1994 and continuing through July 1, 2000, Stewart served as the Director of Education Services for the District.  In this position, she was a member of the superintendent's cabinet.  The superintendent for the District during this time was John Haro.  Haro previously had worked with Stewart in California and was superintendent when the District hired Stewart.  As Director of Education Services, Stewart had many duties, including responsibility for a budget of over $3,000,000.  She also chaired a committee to create an alternative school and performed a number of other administrative-level tasks.

Prior to holding this position, Stewart had worked as a teacher in a number of schools in Wisconsin, Florida, and California.  She then worked as a specialist for a drug abuse program in the County Office of Education in San Diego, California, a counselor in an adult high school diploma program, and a counselor in a high school.  Next, she taught special education, worked as an elementary school vice-principal, and worked as a high school vice-principal at a school in Antioch, California.  Immediately before starting work for the District, she worked as a testing and curriculum consultant to school districts in California on behalf of a publishing company.  She holds a B.A., an M.A., and a Ph.D.

As a result of budget cuts and a failed tax levy, the District eliminated Stewart's position in 2000.  She does not allege that the elimination of her position in 2000 was improper, discriminatory, or in retaliation for any type of protected conduct.  The District placed her on an unrequested leave of absence following the elimination of

her position. This entitled her to recall rights that allowed her to return to her previous position (if the position were to be restored) or to other positions of equal or lesser rank or pay level that might become available (if she had the necessary licenses and seniority to fill such other positions) for a period of five years. When the District eliminated her position, Haro provided a favorable letter of recommendation for Stewart. Before her last day of work as Director of Education Services, Stewart obtained a new job as the principal of an elementary school in Wisconsin. Stewart worked as principal at the elementary school in Wisconsin throughout the 2000-01 and 2001-02 school years.

In 2001, the position of Director of Secondary Education came open in the District. According to Stewart, this position was second in rank only to the position of superintendent. Stewart asked to be named Director of Secondary Education and claimed her recall rights applied to the position. The District told Stewart she didn't have recall rights to the position because it was a higher rank than her prior position. Stewart claims that it was not truly a position of higher rank but that the District added a stipend to the salary for the express purpose of raising the position to a pay level above that covered by her recall rights. The District also told her that she lacked experience as a high school principal and that such experience was important for the position. The District hired John Currie, a former high school principal within the District, for the position.

In November 2001, Stewart filed an EEOC complaint alleging age and gender discrimination because Currie was male and younger than Stewart (Stewart was born in 1942). Stewart identifies this EEOC complaint as her first act of protected conduct and relies on this EEOC complaint as one of her protected acts for the purpose of her retaliation claim under the ADEA.[3]

---

[3]Stewart argued below and argues on appeal that her retaliation claims arise under the ADEA and the ADA. Although she also alleged gender discrimination in her November 2001 EEOC complaint, the present action does not include a retaliation claim under Title VII.

Between November 2001 and April 2002, the District notified Stewart of several different jobs that were open and available to her through the exercise of her recall rights, given her qualifications and seniority. As to each job, she declined to exercise her recall rights. None of the jobs that Stewart rejected were at a pay level equal to or greater than her prior position.

In April 2002, approximately five months after she filed her EEOC complaint, the District notified her via email that there was an opening for a high school principal and that her recall rights applied to the position. Haro stated in his deposition that the site of the vacancy was not determined when a position was first offered to Stewart because the District followed a lateral transfer policy. The policy gave rights to principals at other schools in the District to claim open positions and transfer laterally when positions came open. Stewart responded that she would accept the position of high school principal "provided that the following conditions are determined and agreeable to me: 1) location of the position, 2) compensation package (i.e., salary schedule, placement, health benefits, degree recognition, etc.)." The District eventually determined that the vacancy was at Eagan High School and notified Stewart of the location. Stewart accepted the position.

Eagan High School is an award-winning school, and the position of principal at Eagan is a high-profile position within the District. Stewart describes Eagan as the flagship school for the District. The actions of concerned and interested parents and faculty members at Eagan, as described below, suggest that these groups agree with Stewart's characterization of the school. These actions also show that the faculty and parents had no reservations about expressing their opinions on matters concerning leadership at the school. These groups were not supportive of having the administration appoint a new principal without first seeking their input.

After Stewart accepted the job at Eagan, Currie, Haro, and others told her that the faculty had wanted an insider—one of the current assistant principals—to be appointed principal and that the faculty were unhappy about Stewart's appointment.

-4-

According to Stewart, Haro told her on May 9, 2002 that the assignment would be "interesting and tough." Stewart also reports that Currie told her the position would be "miserable." Stewart spoke directly to some current and former staff members who, according to Stewart, "cautioned me about taking this position because the staff wanted one of their own and would make my life miserable." The outgoing principal told Stewart to ask for another assignment and reported that "the staff was doing research on [Stewart] and trying to 'dig things up.'"

Haro and Currie were aware of the situation with the faculty at Eagan and met with the faculty immediately after the announcement of Stewart's appointment. Although Stewart was not present at the meeting between Haro, Currie and the staff, she characterizes it as a meeting where Haro and Currie "listened to staff bickerings concerning Stewart without making any effort whatsoever to positively support her." Haro and Currie state that they met with faculty members, told them Stewart was entitled to the principal position through the exercise of her recall rights, and told them the District believed Stewart deserved an opportunity to succeed at Eagan High School. Haro and Currie also state that they would not normally meet with faculty in relation to the announcement of a new appointment, but did so in this instance because they knew of the faculty's concerns and wanted to diffuse the situation.

Stewart was scheduled to visit Eagan on May 16, 2002 to be introduced to the faculty. She attempted to schedule an appointment with the departing principal prior to the faculty meeting, but the departing principal refused to spend substantial time with her in advance of the meeting, stating that it would be too disruptive and that she should come one hour before the meeting. When Stewart arrived for the faculty meeting, she encountered an apparently well-organized show of opposition. Many of the teachers were wearing identical shirts as a show of solidarity. Many teachers asked pointed and hostile questions that reflected a good deal of research into Stewart's past and, although presented as questions, amounted largely to accusatory statements indicting her qualifications, personality, and past performance. Many of

the teachers participated in an organized walk-out from the introductory meeting. The meeting was videotaped and transcribed, without advance notice to Stewart.

Haro and Currie were present for the May 16 meeting. According to Stewart, Haro introduced her and sat down, but did nothing to constrain the hostility from the faculty nor to prevent the videotaping of the meeting. In depositions, Currie described the meeting as "tense and pointed and hostile" and Haro described the meeting as "tense." A transcript of the meeting reveals that Haro introduced Stewart and turned control over to her following the introduction. Stewart does not allege that she asked anyone to turn off the recording equipment.

After the meeting, the videotape and Stewart's resume appeared on the Eagan High School Web site without her knowledge and consent. The videotape was taken off the site because Haro deemed it inappropriate. It is not clear who placed the materials on the site, arranged for the meeting to be taped, or arranged for the meeting to be transcribed. Haro and Currie deny responsibility for these acts and Stewart presents no evidence tending to show who was responsible. When the meeting started, it was apparent to those present, including Stewart, that the meeting was being videotaped.

On May 23, 2002, Stewart sent a letter to Haro asking him to provide more support for her in the form of a transition plan. She also accused Haro of depriving her of support in the new position as an act of retaliation for filing the EEOC complaint in November 2001. Haro delegated responsibility over Stewart's transition to Currie, and Stewart alleges Currie did nothing to assist her. No one from the District conducted an investigation regarding her charge in the letter that the hostile meeting was an act of retaliation. Stewart identifies her May 2002 letter as a further act of protected conduct for the purpose of her retaliation claims.

In May, following the meeting, over ninety percent of the teachers at Eagan High School participated in a vote of no confidence regarding Stewart. On a vote of ninety-eight to three, the teachers passed the following resolution:

> Resolved: That the Eagan High School faculty express no confidence in the qualifications of Dr. Jane Stewart, and urge Superintendent Haro and the ISD 196 Board of Education to replace her with a principal who has significant and recent leadership experience in a large, comprehensive public high school that utilizes cutting edge technology, and who brings a clear vision for continuing Eagan High School's tradition of academic and cocurricular excellence.

On May 28, 2002, Stewart sent Currie an email in which she stated, "It appears that things have not been going well at Eagan and that conditions appear to be very poor." Stewart indicated in her email that she "offered to take and requested other positions for which I am qualified and would like to know what the district plan is [at] this point." Stewart claimed in her deposition that, around the end of May, Currie suggested that she could take a different job that the District would create for her in the District office. She did not accept this offer, and on May 29, she signed a contract to serve as principal at Eagan. On May 31, Haro sent an email to all staff and approximately 6,000 parents. The email stated that Stewart had over thirty years of experience in education including teaching, counseling, and administrative work at the elementary, high school, and district levels. The email stated Stewart was qualified to be principal, Eagan was a "great school," and "[w]e will work to help Dr. Stewart continue that success just as we do with all new principals and other employees."

Stewart completed the 2001-02 school year in Wisconsin and returned to Eagan in July 2002 to begin her new job as principal. In that same month, she was diagnosed with endometrial cancer and had to schedule surgery and follow-up chemotherapy treatments. She used sick leave to attend to her health issues and was off work for parts of July and August. She returned to work on an essentially full-time basis after mid-August. Upon her return, Currie again asked Stewart if she was interested in a

district office staff position. Stewart refused, stating that she wanted to work with students, parents, and teachers. In September and October, she took only limited sick leave for her chemotherapy treatments. These ongoing treatments left her physically weakened, and she limited her participation in certain functions that might normally involve a principal, including some extracurricular and after-hours events such as football games and open house/parent meetings.

Stewart claims that, during fall 2002 when she was present at Eagan in her capacity as principal, she performed her duties well, exceeded all reasonable expectations, and kept the school running smoothly. In addition, she states that some teachers approached her and apologized for participating in the unfriendly introductory meeting. Haro and Currie, however, received numerous complaints from faculty and parents regarding Stewart's performance. In mid-October, a representative from the teachers union, Jim Smola, met separately with Haro and Currie to discuss complaints about Stewart from teachers at Eagan.

Eventually, Currie presented a list of some of these complaints to Stewart, and Stewart alleges that she addressed them to Currie's satisfaction. Some of the specific complaints related to Stewart's absence from specific events; Stewart explained to Currie that her absence was due to her physical weakness related to ongoing treatments. Stewart claims that she responded promptly to all comments from students, parents, or staff, and she received no replies indicating that her responses were unsatisfactory. Notwithstanding Stewart's acknowledgment that Currie approached her with a partial list of complaints, Stewart claims that when anyone made comments about Stewart to Haro or Currie, they referred the person to Stewart for a response, and none of those persons made follow-up comments to Haro or Currie. Stewart requested and received a meeting with Smola, and Stewart believes she addressed the union's concerns to Smola's satisfaction because he did not raise further concerns with Haro or Currie.

On October 16, 2002, the EEOC issued a right-to-sue letter related to the November 2001 EEOC complaint. The EEOC found insufficient evidence to make a determination as to the merits of Stewart's complaint.

Around this same time, school board member Bruce Endler sent a voicemail to Smola and copied it to Haro, Currie, and others. In the voicemail, dated October 25, 2002, Endler defended himself against rumors apparently being circulated by some members of the Eagan High School faculty. He also expressed anger at the behavior of some of the faculty. In the voicemail, Endler made it clear that he believed certain teachers had falsely attributed to him adverse statements about Stewart. As relevant to Stewart's present claims, the content of the voicemail demonstrated that at least some teachers at Eagan knew or believed Stewart had raised some type of legal claim against the District and felt Haro and Currie had abandoned Eagan High School. Also, Endler asserted that statements and actions by faculty at Eagan High School might be interpreted as adding to a hostile work environment for Stewart. Finally, Endler stated that he was disappointed in a perceived lack of integrity among the faculty and in their unwillingness to give Stewart a chance to succeed.

In late October and early November, in an alleged response to the perception that there was conflict between Stewart and the faculty at Eagan, Currie repeatedly offered Stewart the opportunity to transfer to a specially created position in the District office, Principal on Special Assignment. The District asserts that a person was needed in the District Office to coordinate compliance efforts regarding the newly passed No Child Left Behind Act. The District also asserts that the transfer was viewed as a solution to the faculty's unhappiness with Stewart. The Principal on Special Assignment was to coordinate the entire District's K-12 compliance with the No Child Left Behind Act and to receive a stipend of $2,500 above Stewart's salary as principal at Eagan. Although Currie told Stewart the District could transfer her without her consent, Stewart repeatedly refused the invitation to transfer. Stewart viewed the new job as being poorly defined in scope and being a dead-end position

in terms of possible advancement. On November 8, 2002, the District transferred Stewart to the new position against her wishes.

In November 2002, shortly after her transfer, Stewart commenced an extended absence from work using vacation leave, sick leave, and eventually, disability leave. She returned to work briefly in July 2003, but stayed only a short while, resuming her leave until January 2005. In January 2005, she returned to the District office. According to Stewart, when she returned in January 2005, there was no longer a furnished office for her, she had only a shared secretary, and her position had no specific duties. It is undisputed that the District, during the more than two years that elapsed between November 2002 and January 2005, distributed duties related to compliance with the No Child Left Behind Act to other employees.

On December 17, 2002, one month after her transfer, Stewart filed a second EEOC complaint. In this second EEOC complaint, she alleged that her transfer to the position of Principal on Special Assignment was an adverse employment action taken in retaliation for the filing of her November 2001 EEOC charge and in violation of the ADEA and ADA.

Stewart filed the present action on March 26, 2004, while on leave from her position as Principal on Special Assignment. The parties engaged in discovery and the District moved for summary judgment. The case was assigned to a magistrate judge to prepare a report and recommendation. The magistrate judge recommended a grant of summary judgment, and the district court granted the motion for summary judgment.

In granting summary judgment, the court analyzed Stewart's claims as two distinct claims based on two distinct protected acts: the filing of the two EEOC complaints. As to the claim of retaliation arising out of Stewart's filing of her first EEOC complaint in November 2001, the court characterized Stewart's claim as alleging two retaliatory actions by the District: (1) her involuntary transfer in

November 2002, and (2) exposure to a hostile work environment between April 2002 and November 2002. As to the transfer, the court found an outstanding question of material fact as to whether the transfer was an adverse employment action, specifically, whether Stewart received a reduction in title, prestige, job duties, authority, and working conditions. The court ultimately held, however, that Stewart failed to demonstrate a triable question of fact as to whether her involuntary transfer was causally related to her filing of the November 2001 EEOC complaint.

Regarding Stewart's hostile work environment claim, the court did not analyze it as alleged hostility based on retaliation, as argued by Stewart. Rather, the court analyzed the claim as a discrimination-type hostile work environment claim under the ADEA. As a result, the court granted summary judgment because Stewart had not presented "the requisite facts to make out a prima facie case of a hostile work environment based on age."

Regarding Stewart's claims arising out of Stewart's filing of her second EEOC complaint in December 2002, the court considered two allegations of retaliatory conduct by the District. First, the court considered the involuntary transfer in November 2002, and second, the court considered the working conditions Stewart found unacceptable upon her return to work in January 2005. Regarding the involuntary transfer, the court noted that the November 2002 transfer preceded the second EEOC complaint, which she filed in December 2002, such that the transfer could not have been in retaliation for the second complaint. Regarding working conditions in 2005, the court simply concluded that the extended time between December 2002 and January 2005 was too long to support a claim of retaliation.

After the grant of summary judgment and after the parties had filed their initial briefs in the present appeal, the Supreme Court issued its decision in Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405 (2006). In Burlington Northern, the Court expressly held that retaliation claims under Title VII could be based on a hostile work environment and need not be based solely on discrete adverse

employment actions that affect the terms or conditions of employment. Id. at 2414. The Court proceeded to establish a standard to define the concept of a hostile work environment for the purpose of retaliation claims under Title VII. The Court held that actions are considered materially adverse and are actionable in Title VII retaliation claims if the actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (internal quotation marks omitted).

On appeal, it is undisputed that Stewart participated in protected conduct. Stewart alleges that there are triable questions of fact as to whether actions of the District were adverse and whether such actions were causally related to her protected conduct. Stewart objects in particular to the district court's treatment of her hostile work environment claim given the need to focus on causation related to retaliation rather than age, and given the new standards set forth in Burlington Northern. In addition, she argues that she participated in ongoing protected conduct (including her letter in May 2002 alleging retaliation) beyond the mere filing of her EEOC complaints and that this ongoing protected conduct is relevant to the question of temporal proximity for the purpose of analyzing causation.

II.    Discussion

A.    Standard of Review and Applicable Law

We review a grant of summary judgment de novo, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor. Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 910 (8th Cir. 2006).

Without direct evidence of a retaliatory motive, we analyze retaliation claims (whether under Title VII, the ADA, or the ADEA), under the burden-shifting framework of McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under

this framework, the initial burden is on the plaintiff to establish a prima facie case, consisting of evidence: "(1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." Green, 459 F.3d at 914. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a "non retaliatory reason for the adverse employment action." Id. (quotation marks omitted). If the defendant can show a legitimate, non-retaliatory reason for its actions, the burden returns to the plaintiff who "is 'then obliged to present evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual and (2) creates a reasonable inference that [defendant] acted in retaliation.'" Logan v. Liberty Healthcare Corp., 416 F.3d 877, 880 (8th Cir. 2005) (quoting Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002)).

We have described the actual evidentiary burden that a plaintiff must meet at the prima facie stage as "minimal." Logan, 416 F.3d at 881. Where the evidence used to establish a prima facie case meets this minimal burden but is not strong, that evidence, standing alone, may be insufficient to sustain the plaintiff's case at the final stage of the burden-shifting analysis. See id. at 881 ("[A]n employee's attempt to prove pretext requires more substantial evidence than it takes to make a prima facie case because unlike evidence establishing a prima facie case, evidence of pretext and retaliation is viewed in light of the employer's justification.") (quotation and internal marks omitted); Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 944-45 (8th Cir. 1994) (stating that it was error to conflate the ultimate burden of proof with the "minimal" threshold of proof necessary to make a prima facie case, but nevertheless affirming a grant of summary judgment where a defendant had offered legitimate reasons for its actions and there was "no genuine dispute on the issue of pretext and the ultimate issue of defendant's intentional discrimination"). Conversely, where the evidence of causation for purposes of establishing a prima facie case is quite strong, it may be sufficient, standing alone, to prove a defendant's liability without resort to further evidence. See, e.g., Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th

Cir. 2002) ("It is possible for strong evidence of a prima facie case to establish pretext as well.").

Taken together, these cases demonstrate that the burden-shifting framework is merely an analytical construct; the ultimate burden of proving retaliation remains at all times with the plaintiff; and the level of proof required to show causation is less at the prima facie stage than at the final stage of the McDonnell-Douglas analysis. As such, if an employer has articulated a legitimate reason for its actions, it is permissible for courts to presume the existence of a prima facie case and move directly to the issue of pretext and the determinative issue of causation when bypassing the prima facie case analysis leads to clarity in framing the issues under review. We choose to do so in the present case.

B.      Stewart's Retaliation Claims

Turning to the issues of causation and pretext, the District asserted faculty dissent and the need for a district-level employee to address the No Child Left Behind Act as its legitimate reasons for Stewart's treatment and eventual transfer. Stewart must present sufficient evidence to create a jury question as to whether these reasons were merely pretexts to hide an impermissible, retaliatory motive.

i.      Retaliation based on the November 2001 EEOC Complaint and the May 23, 2002 Letter.

Stewart focuses her arguments on showing adverse treatment, but offers little support for her theory of causation. She relies primarily on two factors, temporal proximity and the content of the October 25, 2002 voicemail from school board member Bruce Endler.

Regarding temporal proximity, alleged retaliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be

-14-

caused by a later event. Accordingly, the tense and hostile meeting on May16 and other actions preceding the May 23 letter must be examined for causation only in light of the November 2001 EEOC filing, not the May 23 letter.

The District argues that the six months of time that elapsed between November 2001 and May 2002 preclude a finding of causation or, at a minimum, weigh heavily against such a finding. Stewart argues that we should not consider the relevant time frame to be six months because she was working outside the District and unavailable to be subjected to retaliation. She asserts, instead, that temporal proximity weighs strongly in favor of proving causation because the District retaliated against her at the first available opportunity when she visited Eagan in May and the District immediately took adverse action against her. Stewart points to the District's failure to control the faculty at the May 16 meeting. She also points to the taping and transcribing of the meeting without her permission and the posting of the video and her resume on the Internet.

We agree with the District that the extended period of time in this case fails to support a finding of causation. Although we have recently discussed the difficulty of placing too much reliance on timing as evidence of causation, see Green, 459 F.3d at 915, it remains clear that "[a] gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive," Hesse v. Avis Rent A Car Sys., Inc., 394 F.3d 624, 633 (8th Cir. 2005), and that, given a delay of sufficient length, the "causal nexus tends to evaporate." Shanklin v. Fitzgerald, 397 F.3d 596, 604 (8th Cir. 2005). Here, Stewart's attempt to compress the six-month gap in time fails because her interaction with the District continued throughout the six months. The District repeatedly offered her positions during the six-month window, as required in light of her recall rights. Although Stewart argues that these offers were related to undesirable, lower-level positions and are themselves evidence of retaliation, she has not adduced any evidence tending to show that higher-level positions came available prior to the opening for principal of Eagan High School. She also has not provided any evidence to show that the District failed to offer any such

-15-

positions for her consideration. Because her interactions with the District continued throughout the time she attempts to discount, and because the District took no adverse actions during that time, we cannot accept Stewart's attempt to discount the six-month period.

Regarding events that occurred after she sent the letter on May 23, 2002, the bulk of her interactions with the District occurred in the fall. She was present for a short term in July, but she had to take time off due to her serious health concerns and returned to work later in August. Upon her return, some of the faculty and parents continued to resist her appointment, at least in their complaints and comments to the union representatives and to Haro and Currie. Nine weeks after her return, the District transferred her from her position. Stewart characterizes the District's failure to control faculty as an adverse action that created a hostile environment, and she characterizes the transfer as adverse. Even if we were to assume that the environment at Eagan following her surgery was, immediately upon her return, sufficiently hostile to meet the Burlington Northern standard, two months had elapsed since she sent the May 23 letter, and more than eight months had elapsed since she filed the 2001 EEOC complaint.

More importantly, however, Stewart admits that the faculty's opposition to her appointment was based on permissible grounds, namely, the faculty's desire to have an inside candidate appointed principal. In her deposition, while discussing her reaction to the May 16, 2002 meeting, Stewart stated, "I felt that they wanted somebody inside the District and that I was a scapegoat, that they were going to intimidate and bully me not to take the job because they wanted someone internally." She also stated that she was told as much by the departing principal. From the time Stewart's appointment as principal was announced to the faculty, she lacked faculty support based on the faculty's perception of her qualifications and based on the faculty's anger at not having been given a chance to have input into the hiring process. The transcript of the hostile meeting shows without exception that hostility was based on the faculty's perception of Stewart's qualifications, and this is reinforced by the

vote of no confidence passed shortly after the meeting. Given this evidence supporting the District's legitimate reasons for its action, Stewart may not satisfy her burden of proving causation merely by arguing that temporal proximity ties the adverse action to protected conduct that occurred two to eight months in the past.

Stewart attempts to buttress her claim of causation and pretext by relying on the contents of the voicemail from Endler. Taken in a light most favorable to Stewart, Endler's voicemail revealed that at least some faculty members knew or believed Stewart had filed complaints against the District, some faculty members were circulating rumors that Endler had characterized Stewart's complaints as claims for hundreds of thousands of dollars, and persons at the District were aware of a need to be mindful of possible litigation with Stewart and to avoid acting in a manner that could be viewed as contributing to a hostile work environment.

There is no evidence, however, to suggest what certain faculty members may have known about Stewart's complaint, or when or how these faculty members may have learned of her complaint. There is also no evidence linking this apparent knowledge to any actions by the faculty that made the environment hostile or led to Stewart's reassignment by the District. In contrast, there is clear evidence—Stewart's own admission—that the faculty wanted an insider to be hired as principal at Eagan rather than Stewart and that the faculty members were resentful of the fact that the administration did not seek their input when making the decision to hire Stewart. Finally, vague statements regarding apparent concern by directors or supervisors as to possible litigation with persons who file complaints cannot suffice to prove retaliatory animus. Directors and supervisors would be ill-advised not to act in a guarded and careful manner after the receipt of a complaint. The exercise of such care in no way demonstrates that adverse actions are motivated by a desire to retaliate. If anything, it is evidence of a desire to placate.

At most, then, Endler's October 25, 2002 voicemail might appear suspicious. It does not, however, suggest that the hostile actions Stewart identifies were based in

-17-

any manner on her protected conduct. The evidence is simply insufficient to permit a reasonable jury, without resort to speculation, to draw the inference that any adverse action or hostile environment was based on Stewart's November 2001 EEOC complaint or May 23, 2002 letter. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

ii.     Retaliation Based on the December 2002 EEOC Complaint.

We also find that Stewart failed to generate a jury question as to causation based on the December 2002 EEOC filing. No allegedly adverse actions that preceded the 2002 EEOC complaint could have been in retaliation for the later-filed complaint. Regarding allegedly retaliatory actions that followed the 2002 complaint, Stewart identifies only the unsupportive and ill-defined situation upon her return to the District in January 2005, labeling it a hostile working environment. We hold on the facts of the present case that any conditions in January 2005 were simply too far removed in time from the filing of her December 2002 complaint to establish a causal connection. See Shanklin, 397 F.3d at 604 (stating on the facts of the case that "[w]ith [a] lengthy delay [of ten months], any causal nexus inference tends to evaporate"). Also, given the practical considerations involved in holding a position open for an employee during a two-year absence, no reasonable jury could find that the lack of immediate support and lack of well-defined duties in January 2005 is the type of response that could "dissuade[] a reasonable worker from making or supporting a charge of discrimination" Burlington Northern, 126 S.Ct. at 2415 (quotations omitted).[4]

_____

[4]Because Stewart alleges no protected conduct other than the filing of her December 2002 EEOC complaint to support her ADA retaliation claim, we need not address that claim further.

Because Stewart has not presented evidence sufficient to create a jury question as to pretext and causation, summary judgment was proper on her retaliation claims.

## C.     Stewart's State Law Claims

The district court holds broad discretion under 28 U.S.C. § 1367(c)(3) to dismiss related state law claims after federal claims are dismissed.  Moran v. Clarke, 296 F.3d 638, 650 n.6 (8th Cir. 2002).  Here, Stewart argues only that the dismissal of her state law claims was an abuse of discretion because she believes the grant of summary judgment on her federal claims was improper.  Because the grant of summary judgment on Stewart's federal claims was not improper, we find no abuse of discretion in the district court's dismissal of the state claims.

We affirm the judgment of the district court.

_____