# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 14-2746

———————————————

Rodd Wagner

*Plaintiff - Appellant*

v.

Gallup, Inc.

*Defendant - Appellee*

——————————

Appeal from United States District Court
for the District of Minnesota - Minneapolis

——————————

Submitted: March 11, 2015
Filed: June 12, 2015

——————————

Before WOLLMAN, BEAM, and COLLOTON, Circuit Judges.

——————————

BEAM, Circuit Judge.

Rodd Wagner appeals various district court[1] decisions, the sum total of which limited matters of discovery, imposed sanctions on Wagner's attorney and ultimately dismissed Wagner's age discrimination and appropriation claims. We affirm.

———————————

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

## I.  BACKGROUND

Rodd Wagner worked for Gallup, Inc., for just over twelve years prior to his termination in October 2011.  At the time of his termination, Wagner was a Subject Matter Expert (SME) at Gallup, which Wagner described as someone with extensive experience at Gallup who knew one or more of the practice areas in tremendous depth.  He characterized SMEs as likely to have significant experience and as tending to be "an older group within the Gallup workforce."  Born in 1961, Wagner was 50 at the time of his termination.

In addition to his billable project work as an SME for Gallup's clients, Wagner also co-authored two books for Gallup.  The first, *12: The Elements of Great Managing*, became a *New York Times* bestseller after its publication in 2006.  As addressed by the district court, both parties acknowledge that Gallup is widely known in the human resource business for its proprietary "Q12" employee engagement metric; and that concept was discussed in Wagner's first book.  In 2009 Gallup published a second book co-authored by Wagner, *Power of 2: How to Make the Most of Your Partnerships at Work and in Life*.  Gallup still sells both books.  Wagner balanced his billable client work with the non-billable time he spent authoring and promoting books, with billable time being lower when Wagner was busiest with the writing and publication process.

Although Gallup does not administer formal performance reviews, Wagner received very positive verbal feedback from various individuals in management through the years, including his previous "Go-To" (the closest description of a supervisor in Gallup parlance) Mary Trouba, as well as a regional managing partner, both of whom told Wagner that his billable hours were great and he was performing well.  Gallup likewise recognized his achievements and presented him with many awards during his employment.

Gallup employees did, however, receive Internal Customer Engagement (ICE) scores twice each year based upon surveys completed by coworkers. These scores were aimed at measuring "intercompany relationships" with ratings on items such as "timeliness," "promise," and "partnership." The record reveals that Wagner's ICE scorecards from September 2010, March 2011, and September 2011 reflected a decline in his overall "GrandMean" number. Wagner attributed this fluctuation to differences in evaluators and the number of evaluators. During those years of his employment a large number of his key collaborators left Gallup and thus the people he had worked with closely and developed relationships with were no longer at Gallup to provide Wagner with better reviews.

Sometime around August 2011, Patrick Bogart became Wagner's fifth Go-To at Gallup. Bogart is the only Go-To Wagner claims treated him inappropriately or unfairly or exhibited animus based on his age. Bogart was 35 at the time but had worked for Gallup longer than Wagner. Wagner stated that he and Bogart only interacted twice while Bogart was Wagner's Go To–a phone call on October 6 (that Wagner recorded without permission from Bogart), and a phone call on October 13, during which Bogart terminated Wagner (that Wagner likewise recorded). At that time, Wagner was working on a third book that he believed needed to be finished by the end of 2011. However, Larry Emond, executive publisher of the Gallup Press during the relevant time, testified that Wagner had the idea for the book and had been told to write an overview or chapter so that it could be further assessed. Emond stated that they "never got to a place where [they] formally approved" the book and no deadline or time frame had been placed on it.

Regardless, Bogart called Wagner on October 6 and, among other things, the two discussed Wagner's utilization. For example, the two talked about the SMEs' ongoing transitional situation at Gallup as well as Bogart's difficulty finding a place for Wagner on a team long term given the perception that Wagner was too "self-

referential."[2]  In his deposition, Wagner explained that it was during this phone call that he first learned Bogart was his Go-To, but the two had prior interaction; specifically, Wagner and Bogart had corresponded previously about a possible assignment for Wagner in Iraq that Wagner had turned down.  Wagner and Bogart had a second phone conversation on October 13, 2011, during which Bogart terminated Wagner, informing Wagner that his position had been eliminated.  Subsequently, Wagner sued Gallup alleging an age discrimination claim under the Minnesota Human Rights Act (MHRA) as well as an invasion of privacy cause of action based on the appropriation of his name and/or likeness by Gallup, invoking this court's diversity jurisdiction under 28 U.S.C. § 1332.

In the district court, in order to rebut Gallup's claims that Wagner was difficult to work with, self-oriented and egotistical, as well as to contradict the evidence regarding Wagner's declining ICE scores in 2010 and 2011, Wagner submitted declarations from two individuals who had worked with Wagner in some capacity at Gallup, but both of whom no longer work at Gallup.  One of these former Gallup employees attested to Wagner's good reputation with clients as well as coworkers at Gallup.  Both employees additionally stated their opinion that Gallup initiated a "youthful movement" at some point and targeted older employees for termination.

In addition to Wagner's allegation that Bogart discriminated against him because of his age, Wagner also advanced a claim that Gallup, in general, maintained

---

[2]Wagner claims Gallup offers no admissible testimony that others did not like working with him and that only the declarations offered by Wagner of two former employees that enjoyed working with him are sufficient on this issue.  However, Gallup offered the admissible testimony of Bogart who stated in his deposition that he received information that led him to believe there was very limited interest in Wagner's use as a consultant in the regions and that Bogart considered this in deciding to terminate Wagner.  Bogart's testimony that the comments were made was admissible for that limited purpose.  See Fed. R. Evid. 801(c).

a culture of age discrimination. He claimed in his deposition that Gallup had a pattern of replacing more experienced people with someone junior, giving examples of times when he believed that had happened. Wagner stated that few people retire from Gallup, that they are either squeezed out or terminated before they reach the age of retirement, surmising that "[i]f [the most senior people] were more appreciated, better managed, more of them would still be there." Wagner pointed out that all SMEs that Gallup terminated since 2008 were over the age of 42.

Wagner raised the appropriation claim after realizing that Gallup still described Wagner as a principal of the company on a web page advertising Wagner's books long after Wagner's termination. According to Wagner the website stated "Rodd Wagner is a *New York Times* bestselling author and a principal of Gallup," and Wagner argued that by failing to amend this statement to indicate Wagner was a "former" principal after his termination, Gallup was liable for appropriation.

Gallup filed a motion for summary judgment on all claims. Initially, the district court granted judgment in favor of Gallup on the Minnesota age discrimination claim, but denied summary judgment on the name and likeness dispute. As to the age claim, the court held that given the evidence presented, the matter must be analyzed under the McDonnell Douglas[3] framework. In conducting that analysis, the court determined that even though Wagner's evidence sufficed to establish a prima facie case, he did not present evidence from which a reasonable jury could conclude that Gallup's proffered reasons for Wagner's termination were pretextual. Later, pursuant to Federal Rule of Civil Procedure 56(f), the court determined that Wagner lacked evidence that Gallup intended to appropriate his name or likeness and dismissed that claim as well.

---

[3]McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

On appeal, in addition to the district court's adverse rulings on the age discrimination and appropriation claims, Wagner challenges certain discovery rulings and also the court's imposition of sanctions against Wagner's counsel for issuing particular trial subpoenas.

## II.    DISCUSSION

### A.    Standards of Review

"This court reviews de novo a grant of summary judgment." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)(2)). "On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." Id. (quotation and internal quotation omitted).

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

Id. at 1042 (quotations and internal quotations omitted).

The standard of review of the district court's refusal to compel discovery is for a gross abuse of discretion. Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1052 (8th Cir. 2007). "We will not reverse a district court's discovery ruling

absent a gross abuse of discretion resulting in fundamental unfairness in the trial of the case." Tenkku v. Normandy Bank, 348 F.3d 737, 743 (8th Cir. 2003) (internal quotation omitted). As to the district court's imposition of sanctions under 28 U.S.C. § 1927, "[w]e review the district court's factual findings for clear error and its decision to award sanctions for an abuse of discretion." Id. at 743-44 (quotation omitted).

## B.    MHRA Age Discrimination

The MHRA prohibits an employer from "discharg[ing] an employee" or "discriminat[ing] against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of age. Minn. Stat. § 363A.08, subd. 2(2) & (3). Pursuing a disparate treatment theory, as Wagner does here, requires Wagner to prove that his age "'actually motivated [Gallup's] decision'" to terminate him. Goins v. West Grp., 635 N.W.2d 717, 722 (Minn. 2001) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000) and Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)). Under the MHRA, there are two evidentiary frameworks available for plaintiffs asserting disparate treatment claims–the burden-shifting analysis established in McDonnell Douglas; or the direct method, using direct or circumstantial evidence. Friend v. Gopher Co., 771 N.W.2d 33, 37-40 (Minn. App. 2009). When the statutory text of the MHRA and its revealed purposes are substantially aligned with federal law, Minnesota derives guidance from federal case precedent to conduct its analyses using these methods. Ray v. Miller Meester Adver., Inc., 684 N.W.2d 404, 408-09 (Minn. 2004). Wagner purports to have demonstrated age discrimination under the direct method and also to have established an inference of unlawful discrimination because of his age under McDonnell Douglas.

## 1.    Direct Method

Direct method "cases are adjudicated based on the strength of affirmative evidence of discriminatory motive." Friend, 771 N.W.2d at 38; see also Troupe v. May Dep't Stores Co., 20 F.3d 734, 737 (7th Cir. 1994) (discussing the adjudication of direct-evidence cases and recognizing the "convincing mosaic" of evidence required). The district court ultimately discerned that Wagner's evidence of discrimination was not strong enough to show a link between Gallup's action and an alleged discriminatory motive. On appeal, as he did before the district court, Wagner contends that, together, the following evidence amounts to direct evidence of discrimination: Bogart's young age; Bogart's references to "historically" and "old school;" an allegation that Gallup maintained an ageist workplace; Wagner's outstanding performance record; the unsubstantiated nature of Gallup's stated reasons for termination; and Gallup's retirement program. Wagner cites no supporting case law for his contention that this evidence sufficiently proves Wagner's termination was motivated by his age using the direct method, nor does he offer additional independent analysis.

Wagner's phone conversations with Bogart are key, as Wagner claims that outside of the alleged ageist culture at Gallup generally, it was Bogart who acted upon an age bias and treated Wagner unfairly. Because the use of the words "historically" and "old school" are a primary focus of Wagner's claim and allegedly reveal Bogart's age animus, we include the relevant portion of the conversation verbatim:

PB:    And that, you know there's a–kind of a degree of self-orientation there that maybe they don't want to see.

RW:    Well I would be very eager to correct that, because that's certainly not intended.

PB:    And then you know I think it's too–you know how do we push you and your thinking even more than we have in the past. So,

you know, how do we push you to a point where there's more than you know thinking about the Q12 or the strengths in the way that you have historically but kind of pushing forward a more creative thought process for our clients.

. . . .

RW: But I'm gonna be a lot of more–just based on our conversation right here, I'm gonna install a filter and watch the "I" and "me" references. I truly do intend it, and particularly when I say, hey, could we use–one of the things I'm very frustrated by is I think we could have used the Power of 2 stuff much more–

PB: Yeah.

RW: I think it's a very powerful tool. I am at somewhat of a disadvantage because it's gonna seem like I'm trying to promote my book, I'm not.

PB: Yeah.

RW: It's a Gallup intellectual property, it's a Gallup Press book.

PB: Yep.

RW: And I sometimes feel like I need to be its chief advocate but I suppose that could easily be perceived and I suppose–and based on what you're saying is being perceived as me trying to shield my own book. I'm not. I just think that it's a very powerful thing to be used with–with a lot of our executive teams and I'm eager for the science to be advanced and the practice to grow.

PB: Right.

RW: Truly is where it comes from.

PB: Yeah and I think it's a question of–you know at that time, just making sure that–just sensing whether it has as much relevance as you might think it does and having an ear and kind of an–a comprehension about whether other people are gonna view that as something that is relevant to that business problem or–again it's just–

RW: Yeah–

PB: Or does it feel like old school? You know. I think that's another thing that we have to–

RW: Well I hope the Power 2 stuff shouldn't seem like old school, it's only a 2 year old book. The Q12 stuff I can absolutely understand that you know the same 12 questions, obviously it's a big part of our business but you don't want to be constantly going back to something that we published in 2006 and saying–

PB: Right.

Wagner argues that in combination, the isolated use of the words "historically" and "old school" demonstrate Bogart's age bias on their own and that the district court's finding to the contrary was the result of erroneously making inferences in favor of Gallup. Yet, as stated by the district court, inferring that these words constitute evidence sufficient to utilize the direct method in these circumstances just goes too far and cannot support the "substantially strong" inference required that Gallup acted based on the prohibited animus. Nagle v. Village of Calumet Park, 554 F.3d 1106, 1118 (7th Cir. 2009).

The words used by Bogart–"historically" and "old school"–were not uttered in a vacuum but rather must be placed in context. Viewed in context, these remarks, even though stated by a decisionmaker, do not establish an inference of age animus and require more than Wagner offers to support such a leap under the direct method. See Hamblin v. Alliant Techsystems, Inc., 636 N.W.2d 150, 152, 154 (Minn. Ct. App. 2001) (determining that the combination of company-wide communications and notes from a managers' meeting, echoed by ageist comments of a company executive, created at least a question whether there was an ageist corporate atmosphere); Goins, 635 N.W.2d at 722-23 (discussing direct evidence analyses involving evidence concerning a decisionmaker).

As submitted by Wagner, the transcript of the October 6 phone conversation reveals that, while talking about Wagner's utilization generally and the concerns of regional managers regarding Wagner's ability to collaborate effectively on projects with coworkers, as well as concerns with Wagner's fixed focus on his own research

interests at the expense of uniquely serving a client, Bogart did use the words "historically" and "old school" in the conversation. Bogart used the word "historically" when talking to Wagner about how to get Wagner to think differently about certain concepts than Wagner had *in the past*–a temporal reference. Further, Bogart did not, as Wagner alleges, call Wagner "old school." "Old school" is used during the conversation not to describe Wagner, but rather in response to Wagner's expressed frustration that Gallup did not use his "Power 2 stuff" more and his perception that he was the only one touting the use of his concepts in practice. Bogart recommended to Wagner that before constantly referring to the books he authored, Wagner should consider whether others would find them actually relevant to the issue under consideration with the client or whether it would appear as if the team was not innovating a new solution for the client; that their ideas would instead appear to be "old school." There is simply too great a leap from the context of these word usages to the establishment of a specific link between an alleged age animus and Wagner's termination using the direct evidence method.

Additionally, there is very little admissible evidence to support Wagner's claim that Gallup maintained an ageist workplace. Wagner claims that he witnessed, and has demonstrated here, a pattern by Gallup of pushing out older employees with few retirements, and offers the declarations of two additional former employees who maintain similar beliefs, as well as hearsay from others as told to Wagner that they have heard Gallup executives make ageist comments. This perception is anecdotal, however, and again, falls short of demonstrating a specific link between a discriminatory bias and Wagner's termination sufficient to support a finding by a rational trier of fact that the bias motivated the action under the direct method. Torgerson, 643 F.3d at 1042.

Finally, Wagner's remaining evidence (Bogart's age, Wagner's good performance record, Wagner's allegation that Gallup's alleged hearsay evidence is the only evidence supporting the reason for Wagner's termination, and Gallup's

retirement program) likewise, does not support a strong inference of age discrimination as required in this analysis. Under the direct method, this evidence falls well short because it necessarily requires too much reliance upon inferences. See Friend, 771 N.W.2d at 38. Accordingly, we agree with the district court that the evidence presented requires too many inferential leaps to arrive at a direct conclusion that discriminatory animus motived Gallup's decision to terminate Wagner.

## 2. Burden-Shifting Scheme

Even though Wagner is unable to proceed under the direct method, he may still successfully mount an age discrimination claim under the MHRA applying the McDonnell Douglas burden-shifting scheme. This framework "allocates the burden of producing evidence between the parties and establishes the order of presentation of proof." Goins, 635 N.W.2d at 724. Under this scheme:

> [a] plaintiff must establish a prima facie case of discriminatory motive. If the plaintiff makes this showing, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. If the employer articulates such a reason, the plaintiff must then put forward sufficient evidence to demonstrate that the employer's proffered explanation was a pretext for discrimination.

Id. This framework allows a plaintiff to prove his/her case by way of process of elimination, "disprov[ing] the most obvious legitimate bases for the employment decision, thereby allowing the inference that the decision was motivated by discrimination." Friend, 771 N.W.2d at 37. It was under this framework that the district court analyzed Wagner's claim, determining that Wagner established a prima facie case but was unable to offer evidence from which a reasonable jury could conclude that Gallup's proffered reasons were pretextual. We agree.

-12-

For purposes of this appeal, we assume Wagner established a prima facie case because in the end, we agree with the district court that Wagner is unable to prove that Gallup's proffered reason for his termination is a pretext for discrimination. Id.; Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1043 (8th Cir. 2007) ("[I]f an employer has articulated a legitimate reason for its actions, it is permissible for courts to presume the existence of a prima facie case and move directly to the issue of pretext."). "[W]e need not indulge the parties' disputes about which material facts are in dispute or whether [Wagner] met his burden in establishing a prima facie case under McDonnell Douglas regardless of the 'threshold' we have set for such proof." Riser v. Target Corp., 458 F.3d 817, 820-21 (8th Cir. 2006). Even assuming all of the disputed facts are material, including Bogart's use of the words "historically" and "old school" in the October 6 phone conversation and the inferences derived therefrom favorable to Wagner, he falls short. Wagner has not generated a genuine issue for trial on the ultimate question of discrimination *vel non*. Id. at 821.

Gallup met its burden of offering legitimate, nondiscriminatory reasons for Wagner's dismissal. Gallup determined that Wagner was not meeting its reasonable expectations by October 2011, as evidenced by his diminished internal ratings, his low utilization rate, and Bogart's inability to integrate Wagner into a region due to Wagner's reputation for being self-oriented, difficult to work with and too focused on his own research interests at the expense of the needs of Gallup's clients. Accordingly, Bogart determined there was no way for Wagner to increase his hours and utilization to an acceptable level and that it was thus time for Gallup and Wagner to part ways.

Under McDonnell Douglas, once the employer articulates a legitimate nondiscriminatory reason for the termination, the burden shifts back to Wagner to establish pretext. Hamblin, 636 N.W.2d at 153. "[I]n order to avoid summary judgment under the McDonnell Douglas third step, the . . . plaintiff must put forth sufficient evidence for the trier of fact to infer that the employer's proffered legitimate

nondiscriminatory reason is not only pretext but that it is pretext for discrimination. . . . [A]t all times the . . . plaintiff retains the burden of establishing that the defendant's conduct was based on unlawful discrimination." Hoover v. Norwest Private Mortg. Banking, 632 N.W.2d 534, 546 (Minn. 2001). Wagner "'must prove more than the prima facie case to show pretext, because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification.'" Doucette v. Morrison Cnty., Minn., 763 F.3d 978, 983 (8th Cir. 2014) (quoting Chappell v. Bilco Co., 675 F.3d 1110, 1117 (8th Cir. 2012)).

Specifically as to pretext, Wagner argues the following evidence overcomes Gallup's legitimate reasons for his termination: 1) Gallup's proffered reasons have no basis in fact; 2) he had a strong employment history; 3) Gallup failed to identify any policy justifying Wagner's termination; and 4) similarly-situated younger employees were treated more leniently. However, Wagner is unable to meet his pretext burden. In briefing and at oral argument Wagner maintains an overarching argument that a jury could disbelieve Gallup's explanation. For example, Wagner claims a jury could disbelieve Bogart's statement that the regional managing partners reported to him that none of their teams wanted to work with Wagner and given that possibility of simple disbelief, summary judgment is inappropriate. That is only true, however, if there is a factual basis to support such disbelief beyond Wagner saying so. Too, Wagner offers no evidence that the regional managing partners were acting upon age animus other than his blanket allegation that Gallup maintained an ageist corporate culture generally. Evidence that is merely colorable, or that is not significantly probative cannot be the basis for a denial of summary judgment. Minnihan v. Mediacom Commc'ns Corp., 779 F.3d 803, 809 (8th Cir. 2015); Gibson v. Am. Greetings Corp., 670 F.3d 844, 856 (8th Cir. 2012) ("[G]eneral allegations are not sufficient, specific evidence of disparate treatment to survive summary judgment." (internal quotation omitted)).

Wagner's allegation that he believed Bogart treated other individuals for whom Bogart served as a "Go-To" better, or that Bogart had a better relationship with the others that reported to him, or that Bogart could have managed Wagner better, without more, is likewise of little consequence. In his deposition testimony Wagner points out that at the outset, specifically as to Wagner, Bogart did not provide the basic information, guidance, supervision, coaching, and advice that a manger ought to give an employee who reports to him. Wagner may have some concerns about Bogart's management style but he does not have a MHRA claim. Riser, 458 F.3d at 821 (acknowledging that the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the decisions made by employers except to the extent that those judgments involve intentional discrimination).

Wagner likewise argues that in addition to Bogart's own age animus, Gallup's culture was one that pushed out older employees in violation of the MHRA. In Minnesota, evidence of an ageist corporate atmosphere, along with other evidence, *can be* sufficient to support a reasonable inference of discrimination and is admissible to support the issue of disparate treatment at trial. Indeed, "a prejudiced corporation cannot insulate itself by using front-end managers subject to executive pressures." Hamblin, 636 N.W.2d at 154. So, at times, "the correct issue is not whether the firing agent had discriminatory intent, but whether the firing corporation had discriminatory intent." Id. at 154, 152 (reversing the grant of summary judgment given evidence that a company executive made an ageist remark, echoed by a written human resources document that described a retirement incentive program as targeting older employees, and a memorandum from the CEO instructing managers to hire younger talent).

Wagner's evidence of Gallup's alleged ageist culture, however, is either inadmissible or insufficient to create a material issue as to whether such a culture exists at Gallup. Fed. R. Civ. P. 56(c). Wagner claims on appeal that "Gallup routinely terminated employees in their 40s, 50s and 60s and engaged in a pattern of

replacing older employees with younger, less qualified, recent graduates." In support, he references his own testimony noting particular replacements, along with the sworn declarations of two former Gallup employees that personally share Wagner's belief regarding Gallup's ageist culture. But just alleging this pattern with such evidence, without more, is insufficient to create a question of fact. Too, Wagner claims that the fact that four SMEs terminated by Gallup (including Wagner) were over the age of 50 and one was age 42 proves it maintained an ageist workplace. Yet, Wagner already established that *all* SMEs are older by the nature of the job itself and so the fact that all of the SMEs fired were over a protected age does not necessarily establish a fact issue that age bias motivated those decisions. See Hilde v. City of Eveleth, 777 F.3d 998, 1004-07 (8th Cir. 2015) (discussing the critical distinction in age bias cases between employment decisions wholly motivated by factors other than age but that involve older employees and those prohibited decisions that perpetuate stigmatizing stereotypes based on age). Wagner still needs more. At bottom, and most importantly, Wagner falls short because he does not sufficiently substantiate his claims with probative evidence that would permit a finding in his favor as he must at summary judgment. "A party's unsupported self-serving allegation that her employer's decision was based on [age discrimination] does not establish a genuine issue of material fact." Gibson, 670 F.3d at 857 (quotation omitted).[4]

_____

[4]Wagner claims the district court, in its affirmance of the magistrate judge's order, thwarted his efforts in obtaining the necessary evidence during discovery to establish his age discrimination claim. The magistrate judge allowed certain of Wagner's interrogatory and document requests now at issue but limited their breadth. Wagner requested information about reports or allegations of age discrimination by any Gallup employee from January 1, 2008, to the date of production. Gallup did respond, but limited its response to complaints from employees that worked in Minneapolis with Wagner, or had the same job title as Wagner. The district court held Gallup's interpretation and response to the request was reasonable. See Sallis v. Univ. of Minn., 408 F.3d 470, 478 (8th Cir. 2005) (discussing the enhanced control a district court has over discovery and the balancing that takes place in discrimination matters to narrow discovery). Wagner additionally sought information for every

Wagner additionally cites to his lengthy "unblemished" work history as another example that Gallup's reasons for his termination are pretextual. Indeed, in some cases, such evidence plays a role in a court's analysis of pretext. Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1020 (8th Cir. 2005) (considering an employee's eleven-year, stellar work history with "no employment problems whatsoever" as one relevant factor among many in its consideration in the pretext and discrimination context). Here, however, while we credit Wagner's unquestionable success at Gallup as evidenced by his many awards and accolades in the years preceding his termination, Gallup has established that at the time of his termination, Wagner's utilization rate was low, there was at least some confusion regarding the amount of time Wagner was dedicating to the preparation of a book on Gallup's behalf, his internal ICE scores were declining, and Bogart was unable to integrate Wagner on a team. In combination, even in the light most favorable to Wagner, there is no doubt that unlike the employee in Strate, for example, Wagner's work record was not without blemish. An impressive work history, while it does count for something, does not provide "tenure" in an at-will work environment. People change and an employee's performance can certainly change, for better or worse. So, in the instant

---

Gallup employee since January 1, 2008, including identification information and information about any Gallup-approved discipline or termination, which Gallup claimed was overbroad and unduly burdensome. The district court again granted Wagner's motion to compel this request but only to the extent Wagner sought information of Gallup employees that (a) were terminated; (b) were 50 or more years old; (c) had a comparable employment function to Wagner; and (d) worked in the same region as Wagner. The district court expanded the magistrate judge's determination on this latter request to require Gallup to "produce information regarding *all* terminated Subject Matter Experts in the United States." We have thoroughly reviewed these requests and Wagner's corresponding arguments, cognizant of the breadth of evidence necessary to establish this employment discrimination claim, as well as the district court's response thereto, and find that, given the allowances made, the court committed no gross abuse of discretion. See Elnashar, 484 F.3d at 1052 (standard of review).

analysis, Wagner's prior successes do not ultimately create a question of material fact in support of Wagner's ultimate burden of persuasion in this matter.

Viewed in the light most favorable to Wagner, he is unable to establish that there is a question of fact as to Gallup's motives for his termination. The district court did not inappropriately make inferences in Gallup's favor contrary to the summary judgment standard, but rather plainly viewed the evidence in the appropriate light in conducting its analysis. On the evidence presented, there is no genuine issue for trial on the ultimate question of discrimination. We thus affirm the district court's grant of summary judgment on this claim.

## C.    Appropriation Claim

The tort of appropriation protects Wagner's right of privacy, specifically protecting against one who would appropriate to his own use or benefit Wagner's name or likeness. Restatement (Second) of Torts § 652C. Wagner pursued this claim against Gallup because, according to Wagner, for a period of at least nineteen months following Wagner's termination, Gallup failed to indicate on its website that Wagner was no longer a principal of Gallup on the particular web page (or pages) describing Wagner and listing the two books he had written for Gallup. Specifically, the statement at issue was that "Rodd Wagner is a *New York Times* bestselling author and a principal of Gallup." Wagner does not contend that the website should no longer have referred to him, but argues that the statement at issue should have been modified to describe him as a "former principal of Gallup."

The parties dispute whether Nebraska or Minnesota law governs the appropriation claim. Falling in step with the district court, however, we hold that we need not determine which state's law governs because under either, Wagner's appropriation claim fails. As noted by the district court, under Minnesota and Nebraska law, the appropriation tort is an intentional one. Abdouch v. Lopez, 829

-18-

N.W.2d 662, 673 (Neb. 2013); <u>Kovatovich v. K-Mart Corp.</u>, 88 F. Supp. 2d 975, 987 (D. Minn. 1999). So, to succeed on this claim, Wagner must show that Gallup intentionally failed to add the word "former" to its website page advertising Wagner's books before Gallup can be held liable for appropriation.

On appeal, Wagner claims that he "can present evidence to the jury allowing them to conclude Gallup's refusal to correct misleading statements about Wagner is based on the commercial advantage Gallup receives as a result," but there is no support for this contention on this record. The district court recognized that the website had been "reconfigured" multiple times and that certainly Wagner filed his complaint containing this claim in July 2012, which Wagner claims proves that Gallup knew about the use and failed to correct it. The statement remained on the site, actually, until at least May 29, 2013, when Jane Miller, Gallup's chief operating officer, was deposed and asked about it. The district court further acknowledged that Gallup represented to the court that the page about which Wagner complained had since been deleted and that it was at Jane Miller's deposition that Gallup first became aware of the specific page and language on the website to which Wagner objected.

The district court concluded that Wagner did not come forward with sufficient evidence of the requisite intentionality for his claim to survive summary judgment and we agree. To establish Gallup knew of his claim, Wagner relies upon the length of time the notation remained on the website and the fact that Gallup had, during that time, changed the name for the whole Gallup Business Journal website, along with the filing of the complaint itself as well as Wagner's statements during his deposition testimony that Gallup should insert the word "former" on the website. There was no evidence, however, that at any time prior to its ultimate removal after Jane Miller's deposition at which the page was discussed, that there was any retouching or modification of the content on the relevant page that could have, but did not, correct Wagner's principal status. On this record, summary judgment is appropriate because Wagner fails to make a showing sufficient to establish the existence of an element

essential to his appropriation claim on which he bears the burden at trial. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999).

### D. Sanctions

In early 2013, during discovery, Wagner sought to depose Jim Clifton, Gallup's chief executive officer, among others. In response, Gallup filed a motion for a protective order to quash the notices of depositions issued by Wagner purporting to set six depositions and to prohibit Wagner from taking the depositions of Clifton and James Krieger, Gallup's chief financial officer. Relevant here, the magistrate judge granted the motion in part at a hearing, granting Gallup's request to prohibit Wagner from making further attempts to depose Jim Clifton. Then, in March 2014 Wagner filed a motion and amended motion seeking to compel attendance at trial, either in person or via video conference; or in the alternative, for trial depositions before trial, three Gallup executives, including Clifton; Miller; and Emond. Gallup filed a motion to quash the subpoenas for all three witnesses. At the pretrial conference where the pending motions were heard, the court denied Wagner's motion and confirmed that any subpoenas for such testimony, two of which were already served, were invalid in response to Gallup's then-pending motion to quash them.

Ms. Neumann, Wagner's counsel, invoked the authority of the issuing court–here the United States District Court for the District of Minnesota–when the subpoenas were issued. Fed. R. Civ. P. 45(a)(1)(A)(i). The subpoenas Ms. Neumann served prior to the hearing on the pending motions to compel, commanded the recipients' appearance at the federal district courts for Nebraska and the District of Columbia, respectively, in order to appear "[v]ia video conference with" the Minnesota District Court for five days in April 2014. The district court rightly admonished that "an attorney issuing a subpoena may not take her role lightly and is duty-bound to ensure the propriety of a subpoena that she signs and serves." At the pretrial conference, at which counsel was given the opportunity to address the matter,

Ms. Neumann did not identify any authority for commanding appearance for five days at courts in other jurisdictions for an unauthorized "video conference" with the Minnesota District Court. Indeed she could not do so because there was no authority for such action. Even for the alternative purpose of taking depositions, the subpoenas were wholly improper as Miller had already been deposed, as had Emond, so any further deposition would require leave of the court, see Fed. R. Civ. P. 30(a)(2)(A)(ii), and a protective order was in place regarding Clifton's deposition testimony.

The district court ultimately issued sanctions pursuant to its inherent authority to do so as well as 28 U.S.C. § 1927, which provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." As noted by the district court, sanctions are permitted under the statute after notice and an opportunity for the attorney to be heard have been provided, "when an attorney's conduct, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." Clark v. UPS, Inc., 460 F.3d 1004, 1011 (8th Cir. 2006) (internal quotation omitted).

On appeal, Ms. Neumann argues that the district court failed to make a finding that her behavior was objectively unreasonable or made in bad faith. She claims she issued the subpoenas only because trial was approaching and she had no other method of securing these witnesses. However, the district court's reasoning is clear and when an attorney represents that actions are taken with leave of court, when in fact they are not, such behavior is necessarily objectively unreasonable. See id. The district court did not abuse its discretion in its imposition of sanctions under § 1927.

## III. CONCLUSION

For the reasons stated herein, we affirm.

_____